### BIRD v. MONTGOMERY.

1. The claim of the inhabitants of the town of St. Charles to the commons adjoining the town, conceded to them by the Lt. Governor's of Upper Louisiana in 1797, and 1801, and surveyed by the Surveyor General of that province in 1804, was confirmed by the act of Congress of June 13th, 1812.

2. The rules of the common law are inapplicable to the construction of grants and concessions of the royal domain, during the Spanish government of Upper Louisiana.

3. In the case of a complete grant, of a part of the royal domain, by the crown of Spain, the dominion retained by the King was purely political, and not proprietory. In the case of the St. Charles commons, however, there was no such complete grant, but a mere concession or inchoate title had been made, and the King of Spain undoubtedly retained so much proprietory right as would have authorised him to restrict or modify, though not, perhaps, entirely to abrogate, the commons. This proprietory interest passed to the United States, and they parted with all their interest by the act of June 13th, 1812.

On Appeal from the St. Charles circuit court.

*Bird in propria persona.*

1. That the title under the inhabitants of St. Charles is the better title. Arredondas case, 6th Peter,s Rep. 727 &c. 10 Martin's Rep. 416, Baldwin v. Stafford. Act of 13th June 1812, and letters of Clement B. Penrose and Thomas F. Riddick, 2d vol. U. S. State papers, pages 446–7–8 & 9.

2. If this is not the case, the plaintiff's title under *Giguare* is better than that of the defendant under *Piper.* United

States vs. Perehoman, 7 Peters Rep. from 86 to 91. Arredondas case, 6 Peters Rep. 735, 736. Smith vs. U. S. 10th Peters Rep. 330, 331.

3. It was the custom of the Spanish Government to grant to every established post, town, or village, land sufficient for commons; and these commons were held so sacred, that by law they were declared to be inalienable *even by the King*. Strother vs. Lucas, 12th Peters Rep. 440, 441. 10th Peters Rep. 724, 5, 6, 7, 730–1, 735, 6 and 7. As to effects of a survey made prior to 10th March 1804. See act of Congress of 1814, Geyer's dig. page 475 and our act of ejectment.

4. This claim to commons was confirmed by act of 13th June, 1812, and whether it vested in the inhabitants of St. Charles a fee simple, or a mere usu-fructuary estate, it vested in them such a right as would enable them to maintain eject-ment. 3d M. R. 303, 304, 308—673; 5 M. R. 198; 11th do· 207; 3d do. 460.

5. The commons having been so confirmed, could not have been thereafter granted to another by Congress or the Recorder. Arredondas' case 6th Peters Reports, page 738, and the cases there cited.

6. Piper having neglected to file and have recorded, be-fore the 1st July, 1808, his notice, and the documentary evi-dence in support of his claim, his claim is forfeited, and no evidence can be here received in support of it against a grant from the United States, and no subsequent act of Pi-per, of Recorder Bates, or even of Congress, could so re-vive his claim as to affect the right of commons already con-firmed. Acts of Congress of 1805,1806, 1807, 1812, 1813, 1814. Geyer's Digest, pages 454, 459, 461, 462, 464, 470, 471, 474, 475. Also case of Strother v. Lucas, 12th Peters Rep. 448, 449.

The acts of Congress above referred to in every case (ex-cept in favor of those who were at the time of filing notice, *actual settlers* on the land claimed) argue that notice should have been filed before the first day of July, 1808. The fact stated by Piper that he offered to file his notice, but the re-corder refused to receive it, because unaccompanied by a

SEPT. TERM.
1840.

Bird
v.
Montgomery.

plat of survey, furnishes no excuse for not filing his notice. The recorder acted as by law he should in refusing to record the notice. The act of 1806 repealed so much of the act of 1805, as required the notice to be accompanied with a plat of survey of the land claimed, and extended the time of filing notice. It was again extended to 1st July, 1808, by act of 1807. After this no further time for filing notice was given except to those who were in 1812 *actual settlers* on the land claimed, and the record shows that Piper *was not such actual settler*, either in 1808 or 1812. Piper's notice not having been filed according to law, must be regarded as not filed at all.

7. The proceedings before the commissioner and the recorder, bear upon their face the most conclusive evidence of fraud on the part of Piper, and that Recorder Bates in reporting this claim as confirmed according to any law, acted most clearly under a mistaken view of his powers, and in manifest violation of the laws under which he acted, and as no patent has issued, courts of justice may look behind the confirmation, and determine who has the better title. Sacket vs. Hooper, 3 Lou. Rep. 107. 4th Lou. Rep. 272. 5 Lou. R. 177. 7 Peters Rep. 738 & the cases there cited.

8. Although it is admitted that neither the claim of the plaintiff under Giguare or the defendant under Piper is good *as against the commons*, yet it does not lie in the defendants mouth to dispute the title of Giguare under which he claims, and procured his confirmation.

The claim of the commons aside then, the plaintiff has the better title under the original claimant. 8 Martin's Rep. Rep. 619, &c.

9. The court erred in rejecting the evidence offered as appears, by the bill of exceptions.

### Gamble for Appellee.

First—The claim of plaintiff and defendant under the concession to Giguare:

1. That if the confirmation to Piper could be disregarded, then the plaintiff's claim under Giguare being an unconfirmed claim is barred. 4 sec. act of 2 March 1805, in 2 Story's laws U. S. 967. 5 sec. act of 3 March 1807, in 2 S. L. U.

S. 1060—13 June 1812; " " 1260; " " 3 March

1813; " " 1307; " " 26 May 1824; 3 Story L. U. S. 1959.

2. The confirmation to Piper is conclusive on this title, being equivalent to a grant from U. S. against which this claim of plaintiff's cannot be set up. 12 Peter's Rep. 454.

3. The plaintiff objects to the notice filed as being without warrant of law. This cannot now be questioned. The boards constituted to act on these claims acted judicially, and no person can question their proceedings collaterally; and further, the notice so far as it was of any importance, is put beyond any question by the act of 1816, which confirms this claim as reported for confirmation, that is as the claim of James Piper.

Secondly, we consider the titles as between the commons and the title under the confirmation to Piper. My positions under this second division of the contest are;

1. That no grant of commons has been found.

2. That no use or enjoyment of any specific land as commons has been found.

3. That the survey by Mackay is no legal designation of the claim to commons.

4. That the act of 1812 confirms no claims to commons but such as existed under the Spanish government.

5. That if commons existed under the former government in the inhabitants of St. Charles, it was in connexion with other persons owners of property in the vicinity, and consequently the St. Charles part of the commoners could not alien any part of the land.

6. That if the right of common existed, it was an incorporeal right, and was distinct from the fee in the land.

7. That the sovereign, while such right existed, aliened the fee to the persons under whom defendant claims.

8. That if the right of the commoners was alienable, the alienee would only take the incorporeal right, and could not maintain ejectment for a disturbance.

9. That if the claim to commons is asserted as a grant by the act of 1812, then the Spanish law has nothing to do with it, and the rights under such grant are to be regulated by the common law.

SEPT. TERM.
1840.

Bird
v
Montgomery.

10. By the common law, the plaintiff here, as claiming a right against the grantee of the government, has only the easement, and cant bring an action of ejectment. Authorities on above points. 2 Partidas—act of 28th Dec. 1832, authorizing the Trustees of St. Charles to sell the commons; 14 sec. of act 26 March, 1804; 2 Story L. U. S. 939.

*Opinion of the Court by Napton, Judge.*

This was an action of ejectment, for 800 arpens of land, lying in the county of St. Charles. Judgment being against the plaintiff below, he appeals to this court.

The circuit court found a special verdict, which sets out the following facts :

In the year 1806, Edward Hempstead, as agent for the inhabitants of the town of St. Charles, filed a notice with the recorder of land titles of the claim of the inhabitants of said town to fourteen thousand arpens of land, as commons, which notice was recorded. This notice set forth their claim, as under a concession from Don Zenon Trudeau in 1797, and from Charles Dehault Delassus in 1801 and 1804.

With this notice Mr. Hempstead filed and had recorded sundry documents:

1. A petition from Charles Tayon, dated 11th January, 1797, to the Lieut. Governor Trudeau for a tract of land fronting on the crooked swamp in the low prairie, and extending to the Missouri, adjoining on one side to Antoine Janis, and on the other side to lands not heretofore granted.

2. An answer of said Trudeau, which states that said land petitioned for "being in the vicinity of the village of St. Charles, and of various farms in the prairie of its dependency which would have to go a great deal further to procure wood, said tract shall remain, as well as all others adjoining either in ascending or descending the Missouri, and which have been asked by sundry persons addressed to us by Mr. Tayon, to the Royal Domain, and for the common use of the said village of St. Charles, and for the lands already granted in the prairie, and to be granted hereafter; all which Mr. Tayon shall make known to the inhabitants, and especially to those who have asked for land and whose petitions

I herewith return." This letter was dated January 23, 1797.

3. The proceedings of the villagers of St. Charles, at a solemn meeting at their government house, in which they resolve to enlarge their commons, and they fix the boundaries. Having determined this matter, it was further agreed, that it was proper that the result of their deliberations should be communicated to the Lieut. Governor, and that he be supplicated to preserve to the said inhabitants of St. Charles of Missouri, their upper and lower commons, in their whole and entire state, and they will bind themselves to enclose the same as they have done heretofore." This paper was signed by all the inhabitants.

4. The answer of Charles Dehault Delassus, the then Lieu. Governor, is as follows: "St. Louis of Illinois, 26th February, 1801. All concessions and augmentations of property must be granted by the intendant of these provinces, on a petition, which is to be presented by those persons claiming lands; but if the common of the inhabitants of St. Charles is not sufficient for their cultivation, we do permit them provisionally to enlarge the same according to their wishes, without insuring to them the right of property, which they are to apply for as above mentioned, and the provisional lines of the said augmentation shall be drawn by Captain Antoine Soulard, Surveyor of Upper Louisiana, who is the only person authorized to survey under our orders. It being well understood that nothing shall be done to the prejudice of any person. Signed Carlos Dehault Delassus."

5. A letter from Delassus; dated 23rd Feb'y 1804, to Mr. Charles Tayon, commandant of the post of St. Charles, rebuking said Tayon sharply, for not communicating to him the petition of the villagers of the 27th April 1801, asking a survey of the commons, and referring to his decree of 26th Feb. 1801, by which he says, "the augmentation therein mentioned is granted to them," he proceeds to direct Mr. Tayon to notify persons who have surveys made in the commons asked for, of his intention that the land should be granted as common, and ordering him to take the necessary measures to have the whole surveyed according to his de-

SEPT TERM
1840.

Bird
v.
Montgomery.

SEPT. TERM.
1840.

Bird
v.
Montgomery.

cree. This letter is certified to be a copy of the original, by James Mackay, and that the same was presented to him, (Mackay) by the citizens of note of the village of St. Charles, whilst he was commandant of said village.

6. The petition of the villagers of St. Charles to the board of commissioners on land claims for Upper Louisiana, in which they ask a confirmation of 14000 arpens, and beg the board, if it should be thought that their powers did not extend to cases of this kind, to make the proper representations to Congress, to enable them to get a confirmation.— This petition is dated Feb. 3, 1806. The certificate of the recorder is appended to these papers.

. 7. A plat of survey of the 14000 arpens, to which was the following certificate: "I Don Antoine Soulard, particular surveyor of the establishment of Upper Louisiana, certify that there was bounded, measured and —— with the approbation, and in presence of Messieurs the Syndics of the town of St. Charles of Missouri, a majority of the inhabitants of said town assisting, the land which is designated on the preceding plat of survey, conformably to the petition which they made on the 18th January 1801, and to the decree of Mr. Lieu. Governor, which provides that they shall be put in possession provisionally by means of the plat and certificate thereof of the quantity of land necessary for a common of extent sufficient to answer the people of that establishment, and having calculated the extent, after having performed the operations, it resulted in containing 14000 arpens superficie, measured by the perch of the city of Paris of eighteen lineal feet in length of the same city, according to the field measure of this province, which land situated on the left shore of the river Missouri, and about twenty-one miles north west of this town of St. Louis is bounded as follows: (here follows the boundaries,) which is done in virtue of the decree of Mr. the Lieu. Governor, and sub-delegate of the royal domain, Don Carlos Dehault Delassus, of date 26th Feb'y 1801, and that all the matter above referred to may appear, I give the present with the preceding plat of survey drawn in conformity with the labors performed by the Lieu. Surveyor Don James Mackay of date of the 27th

and of the days following of the month of February of the present year, which conforms to the minutes which I authenticate. St. Louis of the Illinois on the 2nd March 1801, signed Antoine Soulard." I Antoine Soulard, particular surveyor of Upper Louisiana, certify that the preceding plat and certificate agree in the whole with the originals, which remain deposited in the archives of the office of survey in my charge, to which I refer, signed, &c.

The special verdict finds further, that certain proceedings were had on this claim before the board of commissioners, which proceedings are set forth on the record. From these it appears that the testimony of some witnesses was taken, which conduced to establish the importance of the said commons for the convenience of the villagers of St. Charles. It also appears that the claim was rejected by the commissioners. The verdict also finds certain documents to be correct translations of the original, extracted from the records of the recorder of land titles of the United States. These documents are, 1st. A petition from Isadore Lacroix, a merchant of Michilimackinack, to Zenon Trudeau, Lieu. Governor, dated 17th January 1797. This petitioner prays for a concession of a lot near St. Charles and a piece of land at Marais Croche, where he desired to locate. Mr. Tayon writes, in relation to this petition, to the Lieu. Governor, that the lot asked by Lacroix was on the King's domain, but that the land at Marais Croche "has been reserved for the use of the lands in the prairie of the jurisdiction of St. Charles."

2. A petition from Don Antoine Gautier, to the Lieu. Governor, dated Nov. 29; 1796, praying a concession of land at two places, one at a place called Clear Weather Swamp, and another of ten arpens front on the borders of the same, running so as to join the Marais Croche. The Lieu. Governor Trudeau thereupon orders the surveyor, Antoine Soulard, to put said Gautier in possession. But an order of Don Antoine Soulard, dated 17 January 1803, appears, in which he states in consequence of expected difficulties between this petitioner and the inhabitants of St. Charles and Portage des Sioux, and in conformity to official instructions given him by Delassus, then Lieu. Governor, Don James

SEPT. TERM.  Mackay as his deputy is ordered to measure the same quan-
1840.  tity of land mentioned in the petition of Gautier on some
Bird  other vacant place of the King's domain. The special ver-
v.  dict finds the following facts as admitted. "Said Bird claims
Montgomery.  the land in dispute under the inhabitants of St. Charles, and
also by deed from the heirs of Auguste Francois Giguare.
Defendant was in possession at commencement of this suit,
claiming title to six hundred arpens under said Giguare. It
is admitted that whatever title one Pierre Lord ever had in
said six hundred arpens is now vested in Matthew Kerr, un-
der whom defendant holds. It is admitted that whatever ti-
tle the inhabitants of St. Charles had in the premises in dis-
pute is now in the plaintiff. It is admitted that whatever
title Auguste Francis Giguare died seized of, is now in
plaintiff."

The court further finds a certain ordinance enacted by the
corporation of St. Charles, providing for a conveyance to
Gustavus A. Bird, and a conveyance made pursuant thereto.
It is also found, that the premises mentioned in the declara-
tion are within the limits of the St. Charles commons as sur-
veyed by Mackay in 1804.

The special verdict also finds, that on the 15th day of De-
cember 1808, James Piper filed and recorded in the office of
the recorder of land titles, a notice and affidavit, setting
forth said Piper's claim to 800 arpens, under a concession
from Delassus, 14th May 1800, and cultivation in the years
1801, 2 and 3, and avering that the notice of the said claim
had been presented to the recorder Donaldson, about one
month before the first board of commissoners commenced
their session, and was rejected by said recorder, because
no plat of survey accompanied the same. With the said
notice and affidavit, said Piper filed and recorded a petition
of Auguste Francis Giguare, praying for 800 arpens of land
upon such part of the King's domain as shall be most con-
venient to his interests, which petition was dated 12th May
1800, and filed and recorded a concession by the Lieu. Go-
vernor on 14th May 1800, conceding the petitioner the land
he asked for, so that it prejudiced no one else, and ordering
the surveyor to put the petitioner in possession of the quan-

tity of land he asked, in some vacant part of his Majesty's
domain, and to make out a plat of survey, so that petitioner
might make out his title, &c.   Piper also filed and had re-
corded first, a deed from Giguare to one Pierre Lord, da-
ted Dec. 4, 1804, and second, a deed from said Lord to Piper
dated 5th Dec., 1804.

.The board of commissioners rejected this claim in 1811.
In 1813, the recorder of land titles, acting as commissioner,
took up this claim, and proof was made to him that some
improvements were made on this tract in 1803, and in 1815
this claim was reported by said recorder for confirmation.

It is found, that on the 4th of December 1804, Francis
Giguare was not 25 years old, but probably about 19—that
thirty-five years since, one Durocher lived upon the land in
dispute, and after his death Louis Barada lived there, and
after Louis Barada died, Antoine Barada lived upon the land
until he was turned out by Matthew Kerr, about two years
since—that for the last thirty-five years, James Piper has
not lived on said land, but lived about two, (or ten) miles
from the land, towards Portage des Sioux, where he lived
until his death.   The court found, that Louis Barada took
possession of said land, having purchased a claim to it under
said Durocher, saying he considered it belonging to the com-
mons of St. Charles, but he would risk it; and Antoine Ba-
rada, whilst he possessed said land, said it belonged to the
commons.   The land was surveyed for the first time in 1830.

On this state of facts, the circuit court gave judgment for
defendant.

Before enquiring into the legal effect of these documents,
it is proper to notice an objection raised to the sufficiency
of the special verdict.   The court have found that Mr.
Hempstead, as agent for the inhabitants of St. Charles, filed
sundry documents in the office of the recorder of land titles,
which documents are not declared to be genuine, but are
merely set forth on the record.   The act of Feb. 1, 1839,
concerning evidence, provides, "that all grants and conces-
sions of land, all warrants, orders, plats and certificates of
survey, made and signed by the proper officer of the French
or Spanish government, which shall have been filed in the

I 2

office of the recorder of land titles by virtue of any law of the United States, being certified by such recorder to have been recorded in his office, shall be received in evidence without further proof." By the act of Congress of March 2, 1805, all persons having grants, or incomplete titles under the French or Spanish government, were required to file their concessions, surveys and other evidences of title with the recorder of land titles, before the first of March 1806. The time was extended by subsequent acts of Congress.— These documents were found by the court to have been filed in the proper place, and were therefore under our act of assembly admissible in evidence without further proof than what appears on this record. It would seem to be a strained interpretation of this verdict to suppose that the court, whose duty it was to find facts, should have intended to leave the question as to the genuineness of these documents to mere inference. Not, however, being entirely satisfied on this point, we waive the further consideration of it for the present, and proceed to enquire into the legal effect of these documents, supposing them to be well found.

The record presents two separate claims of title, first the title of plaintiff under the inhabitants of St. Charles, and second, plaintiff's title under Francis Giguare.

We will consider the title of the commons first. It appears, then, that in 1796 and 1797, various persons petitioned the Lieu. Governor Trudeau, for concession of land in the neighbourhood of St. Charles, and these petitions were all refused, on the ground that the Lieu. Governor intended an indefinite quantity of land in that neighborhood should be reserved for the use of the villagers of St. Charles and its dependencies in the prairie. It appears also that the inhabitants of St. Charles in 1801, in solemn meeting, resolved on enlarging their commons, and fixed upon the limits of the commons so enlarged, and petitioned Delassus, the then Lieu. Governor, for a concession of the entire commons. Delassus in his answer to this petition, makes a provisional grant, not pretending to assure them the right of property, which he declares in his decree is only in the power of the intendant of the provinces. He also directs the surveyor of the

crown to run out the lines, in accordance with the wishes of

the inhabitants. This is accordingly done by James Mack- ay in March 1804, and is authenticated by the public sur- veyor under whom Mackay was deputy.

The act of the 13th of June 1812, declares that the "rights, titles, and claims, to town or village lots, out lots, common field lots and commons, in, adjoining, and belonging to the several towns or villages of Portage des Sioux, St. Charles &c. which lots have been inhabited, cultivated, or possessed prior to the 20th day of December 1803, shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages aforesaid, according their seve_ ral rights in common thereto."

The only question is whether this act confirmed the claim of the inhabitants of St. Charles to a common of 14000 arpens, and would enable them, and all holding under them, to maintain an ejectment on such title.

It is insisted by the defendant, that the act of 1812 opera- ted to confirm the titles of claimants only where there was a grant from the Spanish Government, or such long use and enjoyments of a specific quantity of land as would amount to a grant. This position is believed to be correct. But if it is intended by the word 'grant' to exclude all inchoate titles, and such concessions as were made by the representative of the Spanish government, and which did not purport to con- vey all the proprietary rights of the crown, the doctrine ap- pears to be entirely untenable. If the grant from the King of Spain in this case, to the inhabitants of St. Charles, or in any other case, was a complete grant and parted with all his ownership, the rights of the commoners or the rights of an individual, under such a grant, would have been com- pletely protected by the Treaty of 1803 between this Gov- ernment and France, and no act of Congress would have been necessary to give validity to such claims. The act of 1812 speaks of *claims* rights and titles, and the object of that act was to divest the United States of all ownership or claim to such property as comes within its provisions. In this case, there was not only a claim to an indefinite quan- tity of land as far back as 1796, and which was recognized

by the proper authorities of that day, but a more distinct and definite claim, set up in 1801, and expressly conceded by the proper officer, so far as he had authority to make such a concession. The rights of the crown of Spain were reserved in the concession of Delassus, and this government acquiring all the right and ownership which Spain and France ever had, thought proper to relinquish all their interest and confirm the concession of the Spanish commandant. But this claim is fixed not merely by a petition and concession, but a survey made by the proper officer, before the actual transfer of upper Louisiana in 1804. This claim, concession and survey, and all the documents relating thereto, were pursuant to the act of 1805, filed in the office of the recorder of land titles. It was then not only an existing claim under the Spanish Government, founded on a concession from the representative of the crown, but a claim urged upon this Government by a compliance with the requisitions of the law, and brought to the notice of its duly constituted agents. With all these facts appearing on the records of the Government, and filed in the archives of its own functionaries, congress passed the act of 1812, confirming all claims to commons of certain villages enumerated in the act. The claim of the inhabitants of St. Charles to 14000 arpens of commons, conceded in 1801, by the Spanish officer Delassus, and surveyed by the Spanish surveyor Soulard in 1804, and laid before the Board of commissioners in 1808, was in the opinion of this court confirmed by this act.

The objection to the want of a sufficient *user* of these commons, does not arise when there has been a concession, and if such an objection could arise, there is, I think, ample evidence on this record of the *user* established in 1776 and thenceforwards, was of an indefinite quantity of land, and if no subsequent acts of the inhabitants and of the Spanish government had reduced the claim to any more certainty than all the land "up and down the Missouri river," the user might not have been available any farther than particular limits could have been established by competent evidence. But in 1801 the claim and the user were reduced to certainty by a petition, containing a special description by metes and bounds, and a consequent survey in 1804.

The claim of
the inhabi-
tants of the
town of St.
Charles to
the commons
adjoining the
town, conce-
ded to them
by the Lt.
Governors
of Upper Lou-
isiana in 1797,
and 1801, and
surveyed by
the Surveyor
General of
that province
in 1804, was
confirmed by
the act of
Congress of
June 13th,
1812.

It is contended, however, that if the commons existed under the Spanish Government in the inhabitants of St. Charles, it was in connexion with other persons, owners of property in the vicinity, and consequently the St. Charles part of the commoners could not alienate any portion of the land. This argument appears to be founded on certain expressions used by the Lieu. Governor Trudeau in 1796 and 1797, in refusing to make concessions of lands, lying within the limits of the commons, to certain petitioners. The replies of Trudeau, to Mr. Tayon, to Lacroix, and to Gautier, speak of St. Charles, and *"lands in the prairie of its depen-* *"dency,"* or lands in the prairie of the jurisdiction of St. Charles." The application in 1801 was made by the inhabitants of the town of St. Charles, the concession of Delassus is made to them and to no others, and the act of 1812 confirms the commons to the inhabitants of the towns and villages therein enumerated. If the expressions of Trudeau in 1796 are calculated to convey the idea that certain farms in the vicinity of St. Charles were dependencies on that village, and as such were entitled to share the privileges of its inhabitants, they only go to show that the occupiers of such farms constituted a portion of the inhabitants of St. Charles, and as such were entitled to a beneficial interest in the grant or confirmation from congress. Be this as it may, the difficulty, if any exists, is entirely foreign to any question properly arising on this record. Who the inhabitants of St. Charles are, and who can take under that description of persons, is of no consequence to the merits of plaintiff's title. It remains to be considered, what estate or interest the inhabitants of the town of St. Charles acquired from the King of Spain, or by grant or confirmation from the United States.

On this head, the defendant assumes two positions. First, that the right of common, as it existed under the Spanish government, was an incorporeal right, distinct from the fee, and if claimed in this shape will not sustain an action of ejectment. And second, that if claimed under the act of 1812, as a grant from the United States, its character must be determined by the common law, which clearly could not

SEPT. TERM.
1840.

Bird
v.
Montgomery.

The rules of the common law are inap-

SEPT. TERM.
1840.

Bird
v.
Montgomery.

authorize an action.   In examining the first proposition, it is clear that the use of terms derived from feudal customs and feudal tenures would be inapplicable and inappropriate. To speak of "fees" and "incorporeal hereditaments," as ap-

plicable to the construction of grants and concessions of the royal domain, during the Spanish government of Upper Louisiana.

plicable to a people, whose usages and laws were foreign to the countries in which the feudal system prevailed, and were derived from a very different origin, must tend to produce a confusion of ideas.  It is to be regretted, that the absence of authorities on this point, leaves the nature of the laws and customs prevalent in Spanish America, somewhat uncertain, and the only sources of information accessible to the court, are such extracts from Spanish compilations as have been engrafted and commented on in various decisions made by the supreme court of the United States.

It seems to have been the custom with the Kings of France and Spain, to grant to towns and villages a portion of land contiguous thereto, as a common, for the supply of fuel to the commoners, and to furnish pasturage for their cattle, and the King himself could not alienate such commons. Strother v. Lucas, 12 Peter R. 44.   New Orleans v. United States, 10 Peters R. 724, 730.  A careful examination of the laws and usages of both these countries, led the supreme court of the U. S. to the conclusion that these sovereigns could exercise a certain jurisdiction over these commons, and other places similarly situated, but it was purely a police regulation.   New Orleans v. the United States, 10 Peters 7.   Indeed, what kind of proprietary interest can we imagine, existing in the crown which is inalienable?  The very terms of an absolute dominion imply the power of alienation. The dominion retained by the King of Spain, then, was not proprietary, but purely political—a dominion never severed from the sovereignty of our country, and nowise inconsistent with the absolute ownership of a subject.

In the case of a complete grant, of a part of the royal domain, by the crown of Spain, the dominion retained by the King was purely political, and not proprietory. In the case

It is needless, however, to enter into any minute inquiry, in relation to the exact nature of the ownership of the commoners, under the Spanish Government.   Whether corporeal or incorporeal, it was absolute and allodial; and no fee, according to the feudal understanding of that term, was outstanding in the King or any one else.   This is upon the sup-

position of a complete grant, but in the present case there was no such complete grant. A mere concession or inchoate title had been made, and the King of Spain undoubtedly retained so much proprietary right as would have authorized him to restrict or modify, though not perhaps entirely to abrogate, the commons. This proprietary interest passed to the United States, and they parted with all their interest by the act of 1812. The political dominion, if the phrase be admissible, has passed into the State of Missouri.

If then, under the King of Spain, the rights of the commoners were purely incorporeal, they unite under this government, to that intangible interest the absolute proprietorship, ceded by the United States.

The arguments to establish that these commons are inalienable, even by the commoners, I apprehend, are founded on this supposed intangible nature of the right. If the positions which I have advanced be correct, the foundation upon which these arguments are based, is gone. Indeed the whole argument seems at variance with the spirit of our laws, and contrary to the genius of our political institutions. The general spirit and tendency of our government and laws, no judicial tribunal is at liberty entirely to disregard. A construction which tends to perpetuities, will not be favoured. Whilst every thing else is progressive, whilst our most solemn political charters may be altered or abolished by the power which created them, and one generation is denied the power of binding its successors, shall a few French villagers be compelled to stand still in the march of improvement, and abide by a system of customs, which experience and necessity and more enlightened views have taught them to disregard?

It is the opinion of the court, that the legislation of this State may provide the ways and means, by which the inhabitants of St. Charles may dispose of this property. Whether they have done so, in this instance, and whether the law, if such an one exists, has been complied with; is immaterial in this case. The admissions on the record preclude the defendant from questioning the conveyances from the inhabitants of St. Charles to Bird.

SEPT. TERM. 1840.

Bird
v
Montgomery.

of the St. Charles commons, however, there was no such complete grant, but a mere concession or inchoate title had been made, and the King of Spain undoubtedly retained so much proprietory right as would have authorised him to restrict or modify, though not, perhaps, entirely to abrogate, the commons. This proprietory interest passed to the UnitedStates, and they parted with all their interest by the act of June 13th, 1812.

SEPT. TERM.
1840.

Bird
v.
Montgomery.

Entertaining this view of the title under the commons, it becomes useless to examine the titles under Giguare. Piper's claim was not reported for confirmation until 1815, and if confirmed at all, was not confirmed until 1826. It must yield to a previous confirmation in 1812 of the same land to the inhabitants of St. Charles.

The judgment of the circuit court is reversed, and the clerk will enter up judgment for the plaintiff.