# DECISIONS

### OF THE

## SUPREME COURT OF MISSOURI,

### AT

## JULY TERM, 1844.

---

### DENT vs. BINGHAM.

*Ejectment.*—The land in controversy was claimed by the plaintiff, as lessee of the town of Caronde-let, being part of a tract claimed by that town as commons. The town claimed the commons by virtue of a concession from Don Zenon Trudeau, lieutenant-governor of Upper Louisiana, dated 7th of December, 1796. A survey of the commons was commenced in 1797, by Soulard, the surveyor-general, but not completed. On the 7th of June, 1808, the inhabitants of Carondelet filed, with the recorder of land titles, a notice of the claim. The board of commissioners, on the 2d of January, 1812, rejected the claim. The recorder of land titles, on the 22d of August, 1834, certified that the claim was confirmed by the 1st section of the act of Congress of June 13, 1812, and the several acts supplementary thereto. A survey of the commons was made in March, 1834, in pursuance of instructions from the surveyor-general's office, dated February 10, 1834. This survey was a continuation of the western line of the commons, as commenced by Soulard in 1797, and embraced 9905 29-100 acres. The original claim of the town was for 6000 arpens only.

Defendant claimed under Gabriel Cerré, and proved notice to the recorder of land-titles on the 28th of November, 1812, and a concession dated 15th of March, 1799. In December, 1833, the board of commissioners recommended this claim, amounting to 6000 arpens, for confirma-tion, and it was confirmed by the act of 4th July, 1836. The claim of the defendant was embraced within the lines of the commons claimed by the town of Carondelet.

TOMPKINS, Judge, was of opinion that no title in the town of Carondelet was shown to any commons.

SCOTT, Judge, was of opinion that the confirmation of the claim of the town was not by metes and bounds, and only so much land passed as was actually claimed by the inhabitants in the notice filed with the recorder of land titles. They claimed 6000 arpens, and were entitled to that quantity in the direction indicated in their claim; and if that quantity could be obtained without interfering with the rights of others, they could not be disturbed in the enjoyment of their possessions.

As the claim was for a certain quantity of land, and not by metes and bounds, the town was entitled to the quantity claimed, and no more.

NAPTON, Judge, was of opinion, that the claim of the town of Carondelet was for a specific tract of land, designated by metes and bounds; and that the quantity claimed could not be per-mitted to control where specific boundaries were fixed; that whatever ambiguity there might have been in the decree of the lieutenant-governor, Trudeau, in relation to the western line mentioned in that decree, was removed by the survey made by his authority in 1797, and that

this survey being before the board of commissioners, and communicated to Congress, was sufficient to apprize Congress of the extent and boundaries of the land claimed, and that the act of Congress of 13th June, 1812, confirmed the claim to the commons to the full extent claimed before the board of commissioners, by virtue of said decree.

Judges TOMPKINS and SCOTT concurred in the reversal of the judgment of the Circuit Court, which was rendered for the plaintiff below—NAPTON, Judge, dissenting.

APPEAL from the St. Louis Court of Common Pleas.

GAMBLE, for Appellants.

The confirmation by act of 13th June, 1812, is a grant by the government, which is not to be construed as the deed of an individual, most strongly against the grantor, but by it nothing passes except what is necessary to effectuate the purpose of the grantor.— 11 Peters' Reports, Warren Bridge vs. Charles River Bridge; 6 Peters, Arredondo's case.

The title under that confirmation is not now more extensive than when the act was passed, and embraces no other land than was then granted.

The extent of the confirmation is to be ascertained from the evidence upon which Congress acted.

Congress acted alone upon the *claim* for 6000 arpens, and the petition of Gamache, with the decision thereon by the lieutenant-governor; the survey by Soulard; the second certificate of Soulard, and the testimony of Chouteau and Provonchere.

The effect of the notice of claim is to be ascertained by the law under which it was filed.

All claimants were by law required to specify, in their notices, the *extent of their claims.*— Act of 1805, sec. 4; Land Laws, 123.

The specification of quantity, in a notice filed under this law, is not a part of the description of the land, but is a compliance with a substantial requirement of the law, and is a substantial part of the claim, as acted upon by Congress.

If the claim to quantity be considered as immaterial, then the action of Congress, being irrespective of the quantity, and based only upon the documents before them, would be restricted by the land north of the river Des Peres, because, under the order of the lieutenant-governor, there was a survey of that land as their common, which survey was complete, and is not affected by the subsequent certificate of Soulard; nor does the subsequent certificate of Soulard show in what respect the previous survey was incomplete, or what part of the land or lines remained to be surveyed.

If the claim to quantity should be regarded as immaterial, then what is stated above would be the proper result of the construction of the act of Congress: but the claim to quantity, even in ordinary conveyances, is only controlled by calls for such boundaries, or such precise limits as clearly describe the tract conveyed; and in this case there is no such call, or description of the tract. Again, as the law required the extent or quantity of the claim to be specified,

*Dent* vs. *Bingham.*

that extent or quantity, when expressed, would control, in the construction of the grant founded thereon, unless there were great certainty in the boundaries or limits of the claim; therefore, the quantity or extent of the claim is not immaterial.

If we construe the act of confirmation, in relation to the claim and its extent, as presented to the government, then these results will follow:

1. That the village is to have no more than 6000 arpens.

2. That there has been no lawful survey of the commons, under the confirmation.

3. That, until such survey, the village cannot, nor can its lessees, eject a person from any land, as the position and form of the tract remain to be ascertained by survey. There are many acts of Congress, in relation to the survey of these claims, after they were confirmed.

4. The claim, as confirmed, is not adverse to the claims of other persons, whose lands were reserved by the tenth section of the act of April, 1811, and whose lands are not required to make up the quantity confirmed.

This case is altogether unlike the cases of the Saint Louis and Saint Charles commons, where the claims being for specific quantities by surveys, required, that the claims be held to embrace all within the surveys, in order to make up the quantity. There, the claims to commons were held to be clearly adverse to all other titles, and the confirmations were correctly held to cover every acre of the land within the boundaries. No other construction could be given to the grant by the United States.

The whole point of this case is most easily understood and determined by considering the act of 1812 as a deed from the United States, conveying the land claimed.

SPALDING, *for Appellant.*

1. The court improperly gave the first instruction asked by plaintiff below—

1st: Because that instruction assumes that a line running south, 28 degrees west, is the true western line of the pretended grant of commons by Trudeau; whereas it should have been left to the jury, inasmuch as the pretended concession did not specify the line by giving its course according to the compass, but merely says, "a line taken at the end of the common field of said village, and running parallel to the Mississippi, 150 arpens lower down." See Brown and Milburn's testimony.

2d: Because there was no confirmation by the act of 13th June, 1812, unless there was either a *concession*, or *survey*, or user of the land as commons, under the Spanish government, neither of which existed, as to so much of the land as lies south of the river Des Peres.—6 Mo. Rep., 510, Bird *vs.* Montgomery; 7 Mo. Rep., 7, Mackay's Heirs *vs.* Dillon.

3d: Because the act of June 13th, 1812, must be considered as having operated only where there is no reasonable certainty, and as to the land south of the river Des Peres, the claim, as set up, was altogether uncertain.

*Dent* vs. *Bingham.*

4th: Because, there being nothing certain in the claim as filed, except the quantity of 6000 arpens mentioned in the notice, the land belonging to the village of Carondelet as commons depends entirely on the action of the government, in making its location, and that action has not taken place; a survey has been made and disapproved, and the claim is yet unlocated.—4 Story's Laws U. S., 2408; Act re-organizing Land Offices; 2 Story's Laws U. S., 1792, sec. 2.

5th: Because said instruction withdraws from the jury the consideration, whether the claim to commons was or was not *adverse* to the claim of Cerre. In fact, it instructs them that it was adverse, and that the confirmation of it included the Cerre land.— 9 Johns. Rep., 102; 9 Cowen's Rep., 530. These cases show that the question, whether adverse possession or not, is a question for the jury.

2. The second instruction of plaintiff below is wrong in this, that it assumes that the confirmation of the commons was by a fixed and definite boundary, and also, that it takes from the jury the consideration whether the claim and confirmation of commons was adverse to the Cerre claim.

3. The seventh instruction of plaintiff directs the jury to consider the claim for commons as adverse to *inchoate concessions*, within the extent of the claim, which were not expressly, or by necessary implication, excepted.

Under the circumstances, the instruction should have been, that such claim was not adverse to Cerre's grant, unless the testimony convinced the jury to the contrary.

Is Cerre's claim an inchoate concession?

4. The eighth instruction of plaintiff is, that Trudeau's decree is a concession for purpose of a common; this must be intended as to the land south of the river Des Peres, or it is totally irrelevant.

We contend it is no concession in terms, nor by implication.

5. The ninth instruction of plaintiff is exceptionable on same grounds as the seventh, and it is ambiguous. By *confirmation* cannot be meant the recorder's certificate, but the giving or ratification of title.

. This instruction supposes such confirmation operated at its date, to a certain defined extent, to give title south of the river Des Peres.

6. The tenth instruction of plaintiff is exceptionable, on nearly all the grounds taken as to the others: —

It assumes, and withdraws from the jury, that Cerre's grant is within the claim to commons, as filed before the board.

It assumes, that the survey of Brown is the boundary of said confirmation of commons.

It assumes, that the claim to commons as filed, and the confirmation of same, were adverse to Cerre's concessions; a question for the jury.

It assumes, that there was a *concession*, or *user*, as commons, south of the river Des Peres.

8. The instructions of defendant below ought to have been given; their legality depends on the questions already considered. The second assumes, that the lease passed no title, not being executed in the corporate name.—2 Bac. Abr., 5, 6.

*Dent* vs. *Bingham.*

ALLEN, *for Appellee.*

The instructions asked and given on part of plaintiff, and the fourth, eighth, eleventh, twelfth and thirteenth, asked and refused on part of defendant, to the giving and refusal whereof exception is taken, resolve themselves into these inquiries:

1. Was there any commons confirmed to the inhabitants of Carondelet? and if so,
2. What was the extent of such confirmation? and,
3. Was it adverse to the claim of Cerre, under which defendant claims?—all which are questions of law arising on the evidence in the cause.

The second instruction asked and refused on part of plaintiff, is the same with the instruction asked and refused on part of defendant, at close of plaintiff's testimony.

The fifth instruction asked and refused on part of defendant was well refused: 1st: It submits to the decision of the jury a question of law; 2d: It goes behind the confirmation, and assumes, however adverse the confirmation may be to the concession of Cerre, yet, if the claim of common was not adverse, the confirmation did not affect any land within that concession, thereby denying the legitimate effect of the confirmation. See twelfth and thirteenth instructions.

The sixth instruction asked and refused on part of plaintiff was well refused.
1st: It submits to the decision of the jury a question of law.
2d: It assumes, that unless there was a concession, grant, or survey, the confirmation is a nullity. See seventh instruction.

The seventh instruction asked and refused on part of defendant was well refused:
1st: It was a grant; and if not,
2d: It was a question which was wholly immaterial to the case, and, no matter how decided, could not affect the result.

The ninth instruction asked and refused on part of defendant was well refused. It was a duly certified survey, and was evidence under the statute. It was a survey made under authority of law, and by a sworn and competent surveyor, duly certified, and was evidence, though not conclusive, yet entitled to such weight as the jury might give to it. Moreover, Brown, who made the survey, was a sworn witness in the case, and confirmed, by his testimony, the survey, as did also Wm. Milburn, the surveyor-general, as sworn witness in the case.

The tenth instruction asked and refused on part of defendant was well refused.
It submitted to the decision of the jury, what was the extent of the claim to commons, which was a question of law, and besides disregarded altogether the confirmation of common which was the title on which the plaintiff was to recover. It also submits to the jury the correctness of the survey, which is a question of law. See eleventh instruction.

As to the inquiry first above mentioned, Was there any commons confirmed to the inhabitants of Carondelet? the Court is referred to the proceedings before the board of commissioners—the notice of claim—the concession of Zenon Trudeau, of 7th December, 1796—the certificate of Soulard, dated 25th December, 1797,

and 18th February, 1806 — the petition of, and concession to, Alvarez, 18th Nov., 1496— Russell's survey of same in year 1811—petition of, and concession to, Charles Valle, 11th April, 1797—opinion of William McKee, surveyor-general, which is herewith exhibited—of the other surveyors-general found of record, to wit, Rector, Langham, Milburn and Brown—the testimony of user as commons— Delor's testimony, American State Papers — Gale and Seaton's edition Public Lands, vol. ii., p. 672, 447, 449, 450, 451 — D. Green's edition, vol. ii., 549, 377, 378, 379; vol. iii., 587, 677 —5 Term Rep., 124— 3 Cruise's Digest, p. 111,. sec. 39— 4 Com. Digest, 536 —1 Coke Litt., 815, top-paging—Thomas' edition Acts of Congress of 13th June, 1812; 26th May, 1824; 27th January, 1831 —6 Mo. Rep., 510 —7 Mo. Rep., 7.

As to the inquiry second above mentioned, What was the extent of such confirmation? the Court is referred to the proceedings before the board of commissioners—the notice of claim—the concession of Z. Trudeau, of 7th December, 1796—the certificate of Soulard, dated 25th December, 1797, and 18th February, 1806—the petition of, and concession to, Alvarez, 18th November, 1796—Russell's survey of same, 1811—petition of, and concession to, Charles Valle, 11th April, 1797—opinions of Wm. McKee, surveyor-general, herewith presented, and of the other surveyors-general, Rector, Langham, Milburn and Brown—testimony of user as commons—Delor's testimony, American State Papers, above cited— Greenleaf's evidence, 154–5, 164–5, 332— Acts of Congress, 13th June, 1812, 26th May, 1824, and 27th January, 1831.

As to the inquiry third above mentioned, Was it adverse to the claim of Cerre, under which defendant claims? the Court is referred to 6 Mo. Rep., 510—7 Mo. Rep., 7, 16—and to the proceedings on, and confirmation of commons, claimed by Saint Louis, and the survey of same—American State Papers, as cited above, vol. ii., p. 671 —D. Green's edition, vol. ii., p. 549.

No argument can be drawn against the position, that the confirmation of the Carondelet commons was adverse to the concession of Cerre, on the ground that the ‛same was within the exterior lines of the commons, and was therefore not intended to be adverse to the same, for this might be said as to the operation of the confirmation of the commons of St. Louis, within the exterior lines of which were many concessions unconfirmed, and which have since been confirmed by act of 4th July, 1836.

The claims within the commons of Carondelet, and which are set out in the record, with their dates, and that of their confirmations, are omitted.

As to the second instruction asked and refused on the part of defendant, which brings up the validity of the lease, the Court is referred to the act of incorporation by the court—acts of Assembly of 26th January, 1825, secs. 1, 2, and 5; 22d Dec., 1824, sec. 1; 6th Feb., 1839 — the lease to the plaintiff— the various testimony as to possession, by inhabitants of Carondelet, of the commons as claimed by them, to wit, Brown, Delor, Tiernan, LeBlow, Primm, Linkneyer, and the ordinances of the corporation—the payment of rent by plaintiff, under lease to him of premises sued for—the various ordinances in evidence, particularly of 16th January, 1836, in relation to the lease to Jesse Pritchet, of 6th February, 1836, authorizing

the board of trustees to lease the commons; and of 3d March, 1838, authorizing the commons to be leased — 13 Johnson's Rep., 38 — Angel and Ames on Corporations, p. 54–57.

TOMPKINS, J., *delivered the opinion of the Court.*

John Bingham brought his action of ejectment against Frederick Dent, in the Circuit Court of St. Louis county. The judge of that court having been counsel in the cause, it was removed to the Court of Common Pleas. Bingham obtained a judgment in the last-mentioned court, to reverse which, Dent prosecutes this appeal.

On the trial of the cause, the plaintiff proved the incorporation of the town of Carondelet on the 20th day of August, 1832.

The order of the court recites, among other things, that, from henceforth, the inhabitants, &c., shall be a body politic and corporate, by the name and style of "The Inhabitants of the Town of Carondelette."

Bingham claimed the land sued for, under the town; and the instrument of writing by which he claims purports to be made and executed by and between "The board of trustees of the town of Carondelette aforesaid, parties of the first, and John Bingham party of the second part."

It was admitted that, at the commencement of this suit, the defendant was in the possession of the portion of lot No. (41) forty-one in the land claimed, and laid off by the inhabitants of the town of Carondelet as commons, which was included within the lines of the survey of the confirmation to Gabriel Cerre, under a concession made to him in 1789, to be hereinafter noticed, which portion contained 28½ acres, according to the plat and survey made by order of the Court in this case.

The plaintiff then gave in evidence the proceedings before the board of commissioners appointed under the act of Congress of 2d of March, 1805.

On the 7th June, 1808, they gave notice of their claim to the recorder of land titles for the territory of Louisiana, by which it appears, that the inhabitants of Vide Poche, (Carondelet) in the district of Saint Louis, claim title to six thousand arpens of land, adjoining said village, by virtue of a concession from Don Zenon Trudeau, lieutenant-governor of Upper Louisiana, dated the 7th of December, 1796.

The second document is a petition on behalf of the inhabitants of the village, signed by Jean B. Gamache. This petition, dated 6th December, 1796, refers to one previously presented, on the 5th October then next preceding, both praying a continuation of their lands; by which, I presume, is meant, an extension or increase of the quantity of their land, for the purpose of cultivation.

To this petition, the lieutenant-governor answers, that "The land which is demanded is included in what has been reserved for the supply of the wood necessary for the village of Carondelet, and the demand of Mr. Gamache cannot take place; as also, all the concessions granted in the direction of the line taken

74

at the end of the lands of the said village, and running parallel with the Missis-sippi river, one hundred and fifty arpens lower *down*." All these documents appear to have suffered, probably from the fact of the several transcribers being unacquainted with the French language. The meaning of the above passage seems to be this: "that the demand of Mr. Gamache cannot be allowed; and that no other concessions made in the direction of a line beginning at the (west) end of the lands of the village, and running parallel with the river Mississippi, one hundred and fifty arpens lower down, can be allowed."

From all the evidence introduced, we collect, that the land lying betwixt this line and the river (which lies east of the line) was intended to be reserved at least from occupation by individuals, and therefore denied by him to the village for cultivation; and an intimation was given, that those who had located their claims or concessions on that ground, would not be allowed to obtain a grant from the intendant, the agent of the crown. In all the petitions which I have seen, the petitioner seems to consider himself bound to provide that his location do not interfere with others.

Next in order comes the certificate of Mr. Soulard, the surveyor, dated the 25th December, 1797; in which it is stated, that on the 21st day of December, in virtue of the order which the lieutenant-governor directed to M. de Triget, captain-commandant of said village, to enjoin to the inhabitants to make known the line of a tract of land which had been granted to them, under date of 7th of December, 1796, which line is to be parallel with those of Messrs. Antonie, Reilhe and Alvarez. The said inhabitants, in the presence of their commandant, agreed to have their line drawn, (run) to be taken from the last butt (probably stake) set at the extreme part or depth of their land, which had been previously surveyed by Mr. Pierre Chouteau, (that is, they agreed that their line should begin at the south-west corner of their common fields, or forty-arpens lots.) These lots appear, from the surveys in evidence, to lie west of the town; and as the commons lay south of the common-field lots, the beginning corner of the survey of the commons would be the south-west corner of that common field. The surveyor then states, that, "Having found the course of these western lines of the common fields, or forty-arpens lots, to be S. 28 west, he followed the same course 23 arpens 3½ perches, at which distance he found the river Des Peres. The end of the line on the border of the said river has been marked with a little stone, having for witness two flints and a ball of lead flattened, &c. And that this may serve the said inhabitants as proof thereof, I have given these presents at Saint Louis, of Illinois, the 25th of December, 1791. Signed," &c.

In another certificate, dated February 18, 1806, Mr. Soulard, the same surveyor, certifies, that the inhabitants of the village of Carondelet required him to mea-sure for them, either by himself or by one of his deputies, the land which had been granted to them for commons, by the lieutenant-governor, Don Zenon Trudeau; that Mr. Bartholomew Cousin went to the village of Carondelet for that purpose; that, at the moment of proceeding, the compass was out of order, and could not be made immediately fit for use, &c. No survey was made. The recorder of land titles, on the 22d day of August, 1834, certifies, that this claim

to commons is confirmed under the provisions of the first section of the act of Congress of 13th June, 1812, entitled, "An act making further provisions for the settling the claims to land in the territory of Missouri, and of the several acts of Congress supplementary thereto," approved on the 26th day of May, 1824, and of the 27th January, 1831, and refers to the plat. The tract of land bounded west by a line running, as above-mentioned, parallel with the line of Alvarez, 150 arpens, contains 9906 acres and $\frac{29}{100}$, betwixt it and the Mississippi, according to Brown's survey, made by order of the court in this cause.

The petition of Alvarez was also given in evidence, and all the proceedings on it, to the confirmation, as evidence of the right of common enjoyed east of his land before the concession made to him on the 15th of November, 1796.

The material parts of the petition, as translated by the late Judge Leduc, are in these words: "Egenis Alvarez, habitant, resident, &c., humbly petitions your worship to be pleased to grant him, as a title of property, the vacant land which is situate departing from the limits of the *'establishment'* of Carondelet, as far as those of Mr. Reilhe, which your petitioner considers to be about six arpens in front, facing the river Des Peres, by forty arpens in depth, and on the other side of said river ten arpens in front, departing from the said limits of Carondelet, and terminating with lands of the domain, by forty in depth, the whole without prejudice to any person, subjecting himself, as he should do, to the provisions of the laws; which favor he hopes to gain of your grand equity."

Dent, claiming under Gabriel Cerre, proved notice to the recorder of land titles on the 28th November, 1812, and the concession by Perez, dated 15th of March, 1789. In February, 1833, the board recommended this claim, amounting to 6000 arpens, for confirmation, and it was confirmed by the act of 4th July, 1836.

Of the instructions asked by the plaintiff, the court gave—

The 1st: *viz.*, That the act of Congress, approved the 13th of June, 1812, entitled, "An act making further provisions for settling land claims in the territory of Missouri," and the act of Congress approved the 27th of January, 1831, entitled, "An act further supplemental to the act entitled, 'An act making further provisions for settling the claims to land in the territory of Missouri,' passed the 13th of June, 1812," confirmed to the inhabitants of the village of Carondelet, *alias* Vide Poche, all the land lying south of the common fields of Carondelet, and the village of Carondelet, and between the Mississippi river and a line run from the south-west corner of the said common fields, running south 28 west, one hundred and fifty arpens, saving and excepting therefrom all claims theretofore confirmed by the board of commissioners for adjusting and settling claims to land in the territory of Missouri, and all complete grants within the said limits made by the French or Spanish governments, while those governments respectively had possession of the country, and such confirmation takes effect from the approval of said acts of Congress.

The 2d: That if the jury believe, from the evidence, that the land in the declaration mentioned, or any part thereof, is within the exterior lines of the claims to commons confirmed to the inhabitants of the village of Carondelet by the act of Congress approved 13th of June, 1812, and that of 27th January, 1831, entitled

as above in first instructions, and not embraced within any claim theretofore confirmed by the board of commissioners for settling and adjusting claims to land in the territory of Missouri, nor any complete grant made by the French or Spanish governments, while those governments respectively had possession of the country, and that the defendant, at the time of the commencement of this suit, was in possession of the said land in the declaration mentioned, or any part thereof, then, as to the same so possessed and within such exterior lines, the plaintiff is entitled to recover in this action.

The 7th: That the claim of the inhabitants of the village of Carondelet, as presented to the old board of commissioners, and given in evidence in this case, was adverse to all concession inchoate within the extent of the claim, which were not expressly, or by necessary implication, excepted therefrom.

The 8th: That the order of the lieutenant-governor, on the petition of Gamache, constituting a part of the documents before the board of commissioners, which, with the proceedings thereon, have been heard in evidence in this case, is a reservation by legal authority, and is in effect a concession for the purpose of commons.

The 9th: That the confirmation of commons to the inhabitants of the village of Carondelet, read in evidence in this case, was adverse to all concessions within the extent of this confirmation which had not been previously confirmed, or were not complete titles under the French or Spanish governments.

And the 10th: That the claim for commons before the board of commissioners, and acted upon by Congress, in passing the act of 13th June, 1812, and read in evidence in this case, embraced the grant within the lines of the commons made to Gabriel Cerre; and the confirmation of that claim by the act of 13th June, 1812, and the relinquishment by the supplemental act of the 27th of January, 1831, passed the legal title to all the land within such lines, which was in the United States; and the subsequent confirmation of the grant to Gabriel Cerre, read in evidence, passed no title which is a bar to the recovery by the plaintiff in this action.

The court refused to give the third, fourth, fifth, sixth and eleventh instructions asked by the plaintiff.

The defendant then asked, and the court refused to give, the instructions following:

2d: That the lease to the plaintiff, by the board of trustees of the town of Carondelet, given in evidence in this case, passed no title to the land in question, on which a recovery can be had.

4th: That no land was confirmed to the inhabitants of the town of Carondelet, under the act of Congress of the 13th June, 1812, south of the river Des Peres.

5th: If the jury believe, from the evidence, that the claims of the inhabitants of the village of Carondelet for commons, as presented to the board of commissioners, and given in evidence in this case, was not adverse to the claim of Gabriel Cerre under which the defendant claims, then the confirmation, under the said act of Congress of 13th June, 1812, did not affect any land within that concession.

6th: If the jury believe, from the evidence, that there was no grant, concession or survey of any kind south of the river Des Peres, as commons for the village of Carondelet, nor any use of land there for that purpose, under or by the authority

of the Spanish government, then the act of Congress aforesaid did not confirm any land there as commons.

7th: That the decree, or reply of Lieutenant-governor Trudeau to the petition of Gamache, dated 7th December, 1797, given in evidence by the plaintiff, is no grant or concession of any land to the inhabitants or village of Carondelet for commons.

8th: That no land was confirmed as commons for the village of Carondelet by the said act of 13th June, 1812, westwardly of the line indicated in the said decree of Zenon Trudeau, which is a line commencing at the south-west corner of Carondelet common-field lots, and running one hundred and fifty arpens parallel with the Mississippi river.

9th: That if the jury believe, from the evidence, that the commissioner of the general land-office has officially disapproved of the survey of the commons of Carondelet, by Joseph C. Brown, (given in evidence by the plaintiff,) and ordered a new survey thereof, that then the said Brown's survey is no evidence of the extent or boundary of the said commons.

10th: That the said survey of said commons by said Brown, if not made in conformity to the claim to commons by the inhabitants of Carondelet before the old board of commissioners, as given in evidence by the plaintiff, is no evidence of the extent or boundary of said commons, as against the concession to Gabriel Cerre, given in evidence by the defendant.

11th: That Brown's survey of said commons is not in conformity with the claims aforesaid to commons, as confirmed by act of Congress of 13th June, 1812.

12th: That the confirmation of the claim of the inhabitants of Vide Poche to commons, as presented to the board of commissioners, is not more extensive than the claim; and that, if the claim to the 6000 arpens, as asserted before the board of commissioners, can be satisfied without interfering with the land claimed before the board by Gabriel Cerre, and afterwards confirmed by the act of 4th July, 1836, then the plaintiff is not entitled to recover for any land embraced in the claim of said Cerre.

13th: That the grant by Zenon Trudeau, lieutenant-governor, dated 7th of December, 1796, does not annul the grant within the lines of the commons made to Gabriel Cerre; and that the claim for commons before the board of commissioners, and acted upon by Congress, in passing the act of 13th June, 1812, has no greater effect than the said grant, and does not cover the land embraced within the said claim of Cerre.

The court gave the first and third instructions asked by the defendant.

The only evidence of the right of the village of Carondelet to the land here claimed as commons, is in the refusal of the lieutenant-governor, Trudeau, on 7th of December, 1796, to grant the said village a tract of land for cultivation, on the petition of Gamache above mentioned, and in the certified return of Mr. Soulard, of a survey made on the 21st day of December, by virtue of an order which the lieutenant-governor directed to Mr. De Triget, captain-commandant of said village, to enjoin on the inhabitants to make known the line of a tract of land which had been granted to them under date of the 7th December, 1796, which

line is to be parallel with those of Alvarez and Reihle. It is then stated that the inhabitants, in the presence of their commandant, agreed that their lines should begin as above explained, at the south-west corner of their forty arpens or common-field lots. The return of Mr. Soulard being official, and being made in obedience to an order of the lieutenant-governor, which order must be supposed to be lost, as we are told by General Milburn, who had been surveyor-general, that it could not be found in the office while he had the control; this return, I say, must be considered of higher authority than the declaration of Trudeau, made in his answer to the petition of the village, presented to him through Gamache, the only object of that answer being to tell Gamache that his demand could not be allowed.

It was proper for him to speak with more precision to the surveyor who was to execute his order, than to Gamache, who was only a petitioner in behalf of the village, and whose petition the lieutenant-governor, in said answer, intended only to refuse. In his order, which was the warrant for the survey made by Mr. Soulard, it is stated, that the line of the grant was to be parallel to the lines of Reihle and Alvarez, and the villagers were required to show at what point they would begin. They chose to begin at the south-west corner of their common fields, or forty-arpens lots.

They might have begun any where, in the line of their forty-arpens lots, betwixt the eastern and western ends. They chose to begin, as above stated, at the south-west corner of their forty-arpens lots, so that their commons were to be bounded on the north by the forty-arpens lots, on the east by the Mississippi, on the west by a line parallel to the lines of Reihle and Alvarez, and on the south by a line to include, as the petitioners admit, 6000 arpens; and where this closing line must be traced, that is to say, at what distance it was to commence from the place of beginning, (the south-west—of the common fields, or forty-arpens lots,) on the line directed by the lieutenant-governor to be run parallel with the lines of Reilhe and Alvarez, could be ascertained by actual survey only. It is not only absurd to suppose that the lieutenant-governor would, in his office, pretend to dictate how long that western line must be to contain 6000 arpens of land, but it is contrary to the practice of such officers. They prescribe the quantity, and leave the remaining part to the party petitioning, and the surveyor.

To make common sense of the writing called Gamache's petition, (in itself unintelligible, either in the original or the translation,) we must suppose that Gamache and the villagers had some previous knowledge of the intention of the lieutenant-governor to decree a grant of commons, and in anticipation of such grant he, Gamache, on behalf of the village, presented the petition on the 6th of December, for a part of this land for the purposes of cultivation; for the lieutenant-governor answers—"The land which is demanded is contained within that which is reserved to furnish the wood which is necessary to the village of Carondelet, and that the demand cannot be allowed, (*ne pent avoir, lien, &c.*,) nor any others made in the direction of a line beginning at the end of the lands of said village, and running parallel to the Mississippi, one hundred and fifty arpens

lower down." The answer to the petition is dated on the 7th of December, 1796, one day later than the petition itself.

Mr. Soulard, in his official certificate, states this concession of commons to have been made, on the 7th of December, 1796, and according to him the western line of the commons was ordered to be parallel—not to the Mississippi, but to the lines of Reilhe and Alvarez, and the inhabitants were to make known the beginning, and nothing is said to Mr. Soulard about the length of this line. The very object of the survey was to ascertain the length of that line.

It cannot surely be supposed, that Mr. Soulard, the surveyor, was so grossly ignorant as to call this answer to Gamache's petition a grant of commons to the village. We must suppose, then, that he recites truly the concession, and that it is lost.

The answer of the lieutenant-governor was accurate enough for the purposes of Gamache, and for those whose interests he represented—that they could obtain no land betwixt the Mississippi and a line drawn from the south-west corner of the common-field lots of Carondelet, one hundred and fifty arpens lower down, parallel to the river. This was accurate enough for their purposes, especially as he intended, on the same day, to make the order of survey, and, according to Mr. Soulard's recital in his official act, did make it. Mr. Trudeau might have thought the lines of Reilhe and Alvarez to be parallel to the Mississippi, for let it be recollected, that he did not there have before his eyes, as we now have, the plat made by Mr. Brown *forty years* afterwards.

The answer to the petition of Gamache was sufficiently accurate for common purposes: but when he addresses the officers who were to carry his orders into execution, his tone is changed; he is accurate and precise; the western line of the commons is to be parallel to the lines of Reilhe and Alvarez; the villagers may choose the place of beginning. Their interest was the inducement to begin on the southern boundary of the common-field lots; and the length of that line, to contain, betwixt it and the Mississippi, 6000 arpens, must depend on its distance from the Mississippi. And the answer to Gamache's petition is, that the western line will begin at the south-west corner of the common-field lots, and run 150 arpens lower down, parallel to the river Mississippi, within which limits he, the lieutenant-governor, might be assured the quantity of 6000 arpens would be included. As has been observed, the petition for these commons, and the order of survey, must be presumed to be lost, or rather we are left to presume, from the certified return of the surveyor, that there was a petition for the common, and a decree in favor of the petition, and that, by the decree, the petitioners were allowed to choose the place of beginning, provided the line were parallel to the lines of Reilhe and Alvarez. The petitioners themselves have furnished the amount of land prayed for and accorded to their prayer, and it is quite idle to suppose that the lieutenant-governor would, from his office, pretend to dictate to the surveyor of his district how long that line must be, to contain betwixt it and the Mississippi the quantity of land which he conceded; much more idle would it be to suppose that he should, in his answer to Gamache's petition, given on the same day, be supposed to be making out an order, under which Mr. Soulard, the surveyor,

*Dent vs. Bingham.*

was intended to act. We are driven, then, to the conclusion, that the statement of the place of beginning, and the course of the western boundary line, as set out in Mr. Soulard's official act, is true: this statement is certainly the highest evidence, after the petition and decree, and cannot be disproved by anything else than the absent documents themselves, *viz.*, the petition and decree. In fact, the answer to Gamache's petition is not admissible evidence in this case: it is no more than hearsay evidence on another subject.

We may certainly trust the petitioners for the quantity; their modesty would not hinder them from asking enough; and it is so absurd to suppose that Mr. Trudeau would order the surveyor how long to make that western line, he himself not even knowing how far west of the river the villagers might elect to fix the north-west corner of their commons, that we are equally driven to the conclusion, that it was intended that Mr. Soulard, the surveyor, should ascertain the length of that line, in order to include the quantity of 6000 arpens, a work, it must be admitted, of some labor, inasmuch as it is in evidence that neither is the line parallel to the river, nor is the river exactly straight opposite to that line.

In my opinion, then, the western line of the commons was run in the proper direction, as reported in the survey of Mr. Brown given in evidence, but that line should have continued so far only from the south-west corner of the common-field lots, as to include betwixt itself and the river the quantity of 6000 arpens; and whether the land in dispute would be included within such limits, does not appear on this record.

But it is contended, that the petition of Alvarez is evidence of the existence of commons south of the river Des Peres previous to his concession, which is one month previous to the concession of commons recited by Mr. Soulard's official return. To say nothing of the absurdity of a title accruing without concession, which could accrue only by concession, and by the complete title issuing from the intendant-general, let us resort to the petition itself: it prays for land to depart both north and south of the river Des Peres, from the "*limits of the establishment of Carondelet;*" and it is contended, that this means the *commons* of Carondelet. The corresponding Spanish word is, *Establecimiento:* in French, it is *Establissement:* in English, *Establishment:* all derived from the Latin, *Stabilimentum*, I suppose, as we are told, by Ainsworth, the English word *Establishment* is, and this word means nothing more, in the popular language of the French of Missouri, than is implied, in the popular language of the Anglo-Americans of the same country, by the word "settlement." A creek in Saint Genevieve county is extensively known by the name of the "Establishment creek," on account of a settlement made there, many years since, by some French families. No man, even moderately acquainted with the history of the Spanish language, could believe, that a Spanish word, derived from the Latin "stabilimentum," or one which corresponded to the French word "establissement," would be used for the English word "common;" and still less can it be believed that the translator to the board of commissioners, who, it is well known, had been secretary to the Spanish lieutenant-governor, would have failed to translate the word "common," instead of establishment, as he has rendered it. But what establishment or set-

tlement had the village of Carondelet, from the limits of which Alvarez prayed that his land might depart? The answer is easily made from the record. It was this mill, and a cabin or two, perhaps, near it, which Gamache mentions, and which emboldened the villagers, with a presumption truly corporate, to demand all the land from the Mississippi river on the east, to the farm of Constant on the west, and from the river Des Peres on the south, to the village lots on the north, about three thousand acres, perhaps. It may be fairly presumed, that they had long claimed this land as appurtenant to the mill, of which Gamache speaks very ostentatiously in the petition above mentioned. It might thus have acquired the name of the establishment of Carondelet; for it requires no stretch of imagination to enable one to conjecture that the mill was on the river Des Peres, and on the land prayed for. But it is idle to say, that a letter of Trudeau, denying certain lands to the village for purposes of cultivation, is a decree granting the same lands to the same village for commons: and the official return of Mr. Soulard is evidence that a decree had been made; and, as is contended by Mr. Gamble, the village must either take the survey where he terminated it, on the bank of the river Des Peres, or they must take the quantity demanded, 6000 arpens. The certificate of Mr. Soulard, subsequently given, (in 1806) is not evidence. His authority to survey, under a decree of the Spanish officer, had then ceased. It cannot, however, be said that his proper return shows that he had completed his survey, but it shows rather the contrary. The survey, then, ought to be completed in conformity to what is learned from Mr. Soulard's return, and the quantity stated by the petitioners.

It remains to be inquired, whether the confirmation certified by the recorder, on the 22d of August, A.D. 1834, to have been made for 6000 arpens, in virtue of the act of 13th June, 1812, entitled, "An act making further provisions for settling claims to land in the territory of Missouri," and other acts of Congress, to wit, the act of 26th May, 1824, and that of 27th January, 1831, be adverse to that of Dent claiming under Gabriel Cerre. It will be borne in mind, that the concession to Cerre was made on the 15th of March, 1789, by Perez, seven years before that to the village of Carondelet. Whenever the term prescribed to one board has expired, Congress have created another tribunal, excluding from it the right to adjudicate on cases already decided. Frederick Bates, under the act of 13th June, 1812, was clothed with all the powers of the first board, but cases decided on by that board were withdrawn from his jurisdiction.

In Bird *vs.* Montgomery, 6 Mo. Rep., it appears, that the claim to the Saint Charles commons, confirmed by the act of 1812, prevailed over that of Guigarre reported by the recorder for confirmation in 1815, and consequently confirmed by the act of the 29th April, 1816, p. 510. In the case of Newman *vs.* Lawless, 6 Mo. Rep., 293, I advanced the opinion, that the act of 1812, and the above-mentioned act of 1824, availed the several claimants of village lots, out-lots, and commons, nothing, unless they presented their claims before the recorder, but operated only to reserve those lots and lands from sale. Congress, in passing the act of 1824, seems to have entertained that opinion also. In this case, the president of the court did not sit, and my colleague, Judge Napton, concurring in

the judgment entered, expressed, in writing, his dissent on the point above mentioned. In the case of John Hammond *vs.* President and Directors of Saint Louis Public Schools, decided at this term, (July, 1843,) I expressed the same opinion, and gave my reasons more at large than in the case of Newman *vs.* Lawless. But neither of the sitting judges expressed either assent or dissent, although they gave a separate opinion.

According to my opinion, then, on the last-mentioned point, the corporation, not having appeared, on this record, to have brought their claim either before the recorder or the late board of commissioners, have shown no title to any commons, and the plaintiff in error must, in this view of the case, ultimately gain it; but it would be decided otherwise, on the authority of Bird *vs.* Montgomery, 6 Mo. Rep., 510, above mentioned.

The survey of Mr. Brown not being made, as I believe, according to the intention of the lieutenant-governor, Trudeau, the Court of Common Pleas committed error in giving the first and second instructions asked by the plaintiff below.

For the same reason, I am of opinion, that the tenth instruction demanded by the plaintiff below, defendant in error here, should not have been given.

In the seventh instruction asked by the defendant in error, I can see no meaning. I suppose that every person and every body corporate, that presented a claim before the old board of commissioners, set up a claim adverse to all the world, except the United States; and one principal object in the establishment of that board was, to separate the private property of one individual from that of another, and to ascertain to which of two individuals, claiming the same property, that property belonged. That board does not appear, on this record, to have confirmed the village claim to commons; and the claim filed before that board, consequently, amounts to nothing. The seventh instruction, then, should not have been given.

The eighth instruction was, in my opinion, most erroneously given; for the lieutenant-governor made no order on the petition of Gamache, in this record set forth, except, that the village of Carondelet could not obtain the land demanded by it, for the purpose of cultivation. It is true, that he assigned a reason for refusing that demand, but by no plausible reasoning ever can that reason, assigned for refusing the land demanded by the inhabitants of Vide Poche, for purposes of cultivation, be tortured into a concession to the inhabitants of the said village of $9,905\frac{200}{1000}$ acres of land for commons. It does not even amount to a verbal promise, or any kind of a promise, to do so; he says it is reserved! How reserved? No surveyor would receive this written answer to Gamache's petition as an order to survey so much land for commons. If, then, there is any evidence of their claim, it is contained in the return of Mr. Soulard, above mentioned, as certified by him. The eighth instruction, then, should not, in my opinion, have been given.

*The ninth instruction.* If any confirmation of commons to the village of Carondelet was read in evidence, it has escaped me, as it well may have done, in such a mass of matter appearing to me wholly irrelevant. Mr. Conway, the recorder, certifies that the claim to 6000 arpens was confirmed by certain acts of Congress, of which, I suppose, this Court was in duty bound to take notice. According to the

case above mentioned, of Bird *vs.* Montgomery, 6 Mo. Rep., 510, this instruction should have been given. In my opinion, there has been no confirmation of this land, or any part of it, to the village, inasmuch as the several acts of Congress, as I have above said, operated only to reserve this land from sale by the register and receiver, and to appropriate to the use of the United States, for military purposes and for schools, such part as should not be proved before the recorder to be either private property or commons, and it was still the duty of all parties claiming town or village lots and commons, after the act of 1812, and the other supplementary acts, to come in and make proof, before the recorder, of their respective claims, for the purpose, as well of ascertaining the property of individuals and towns and villages respectively, as of separating the private property of each person, town or village, from that of the United States and the schools.

Of thirteen instructions asked by the plaintiff in error, the court refused the second, fourth, fifth, &c., but gave the first and third.

The second instruction asked by the plaintiff in error should, in my opinion, have been given. As above mentioned, the inhabitants of Carondelet were incorporated by the name and style of " The Inhabitants of Carondelet," and the lease purports to be executed by and between the trustees of the town of Carondelet, parties of the first part, and John Bingham, party of the second part.— See 2 Bac. Ab., 5 and 6.

4th *Instruction.*—It does not appear, from the survey, how much land lies north of the river Des Peres. I should say that, according to the decisions of this Court hitherto made, 6000 arpens of land were confirmed to the village, to begin at the south-west corner of the forty-arpens lots, and run for quantity parallel to the lines of Alvarez and Reilhe; but my present beleif is, that the village can get nothing, as its claim does not appear on this record to have been presented to the recorder, or to any board of commissioners, for the ascertainment of its limits.

5th *Instruction.*—I have above said, that, in my opinion, each claim presented before the first board of commissioners was adverse to the other, and that, consequently, each claimant was bound to attend, and contest every claim conflicting with his own.

6th : The sixth instruction should not, in my opinion, have been given, the village being entitled, in my opinion, to 6000 arpens, surveyed as above mentioned, and the survey does not show whether there was 6000 arpens north of the river Des Peres.

7th : The seventh should, in my opinion, have been given.

8th : This instruction should not have been given : the only legitimate intimation of Trudeau's will, of which we have any evidence, is contained in Mr. Soulard's certified return of his survey, and this calls for a line runing parallel to the lines of Reilhe and Alvarez.

9th : This instruction should not have been given : the right of property in the contested land is to be decided by the laws of the United States, as pronounced by the courts, established by act of Congress, either of general or special jurisdiction, and not by the commissioner of the general land-office, a mere ministerial officer.

10th : This instruction should have been given.

11th: This instruction, also, should have been given, as the village claimed only 6000 arpens, and Mr. Soulard's certificate shows, that the length of the western line was not prescribed to him by any legal authority, and common sense shows that no such order could have been given by the lieutenant-governor.

12th: I cannot see any propriety in the twelfth instruction. It was the duty of Gabriel Cerre to attend the board: nothing hindered him from attending the old board; and if, by his neglect to do so, he lose his land, he has no reason to complain. The grant of the lieutenant-governor was a nullity, until ratified by a patent from the intendant, and he, having shown gross negligence under the Spanish government, can have nothing to urge against the United States, before whose commissioners he has neglected to appear, to adjust his claims.

13th: This is answered in the twelfth instruction.

The judgment of the Court of Common Pleas is reversed.


Scott, *Judge.*—I concur with Judge Tompkins, in reversing the judgment.

The confirmation of the claim to the commons was not by metes and bounds, and only so much land passed as was actually claimed by the inhabitants, in the notice which was filed with the recorder of land titles. They claimed 6000 arpens, and are entitled to that quantity, in the direction indicated in their claim; and if that quantity can be had, without interfering with the rights of others, I do not see on what principle they can be disturbed in the enjoyment of their possessions. In the cases of the St. Louis and St. Charles commons, surveys accompanied the claims, and the title to the lands comprehended *within the limits* of the surveys were declared to have passed by the act of confirmation. In this case a survey is not relied on, but a declaration from the lieutenant-governor, in answer to a petition for a concession of land. As the claim was for a quantity, and not by metes and bounds, the plaintiff is entitled to the quantity claimed, and no more.


Napton, *Judge, dissenting.*

This was an action of ejectment, to recover a lot of ground, in St. Louis county, lying south of the river Des Peres, and embraced within a survey of the supposed commons of the town of Carondelet. The plaintiff held a lease for ninety-nine years, from the board of trustees of Carondelet.

The town of Carondelet was incorporated in 1832, by the County Court of Saint Louis, by virtue of the authority vested in said court, by an act of the General Assembly, approved 16th January, 1825, entitled, "An Act to provide for the incorporation of towns."

The lease made to the plaintiff (below) was in the name of the "Board of Trustees of the Town of Carondelet," and was by virtue of an act approved December 22d, 1814, entitled, "An Act concerning Commons." The town was incorporated by the name of "The Inhabitants of the Town of Carondelet."

It was admitted, that the defendant, at the commencement of this suit, was in

possession of that portion of the lot described in the declaration as claimed and laid off by the inhabitants of the town of Carondelet as commons, which was included within the lines of the survey of the confirmation to Gabriel Cerre, under a concession made to him in 1789, which portion contained 28½ acres, according to the plat and survey made by order of the court in this case.

The title of the town of Carondelet to commons, under which plaintiff claimed, rested on the proceedings before the recorder of land claims and the board of commissioners, and the act of 13th June, 1812, all of which are set forth at large in the bill of exceptions, and appear to be, in substance, as follows:—

1st: On the 7th of June, 1808, the inhabitants of Carondelet filed with the recorder of land claims for the territory of Louisiana, a notice of their claim, which was as follows:—"Take notice, that we, the inhabitants and settlers of the village of Vide Poche, in the district of Saint Louis, claim title to 6000 arpens of land, situate adjoining said village, by virtue of a concession from Don Zenon Trudeau, lieutenant-governor of Upper Louisiana, dated 7th December, 1796." This notice was accompanied with the documents alluded to therein, to wit—

2d: The petition of Jean B. Gamache, on behalf of the inhabitants of the village of Carondelet, asking of the lieutenant-governor, Trudeau, an extension of their common fields, so as to embrace a tract of land bounded by that of Benjamin Constant, and the Mississippi and the River Des Peres, lying north of said last-mentioned river.

3d: To this petition the lieutenant-governor replies, that the land petitioned for has been reserved for the necessary supply of fire-wood to the village, and the demand of Gamache could not take place: "*Ainsi que toute concessions, accordies dans la direction de la ligne prise a toute des terres du dit village, et courant parallelement an Mississippy, cent cinque arpens plus bas.*" (Nor could these concessions *take place*, which had been granted in the direction of a line taken from the end of the village common fields, and running parallel to the Mississippi, one hundred and fifty arpens lower down.)—The date of this answer, or concession, was, 7th December, 1796.

4th: The certificate of A. Soulard, dated 25th of December, 1797, stating, that on the 21st December, by virtue of an order directed to him by Mr. De Treget, captain-commandant of said village, enjoining the inhabitants to make known the line of a tract of land which had been granted to them, under date 7th December, 1796, which line was to be parallel with those of Antoine Reilhe and Alvarez, he had proceeded, in the presence of said inhabitants, to make said survey. By consent of said inhabitants, he commenced at the "last butt," set at the extreme part or depth of their land, which had been previously surveyed by Mr. Pierre Chouteau, by virtue of an order from the lieutenant-governor. The course of the western line of the common fields he found to be S. 28° W. The certificate proceeds thus : "I followed the same course (*i. e.*, S. 28° W.) 23 arpens 3½ perches, at which distance I found the river De Peres. The end of the line, on the border of said river, has been marked (*borneè*) with a stone, having for witnesses two flints and a bullet of lead flattened; the land of the said Alvarez being about twenty-four feet distant from said stone, in running the line further in

a parallel direction. And as this may serve to the said inhabitants as proof thereof, I have delivered these presents at St. Louis, of Illinois, the 25th December, 1797. Antoine Soulard."

5th: A second certificate of Soulard, given the 18th February, 1806, that the inhabitants of Carondelet had again called upon him to measure, or cause to be measured, a part of their commons; that he had deputed Mr. B. Cousin to execute this survey, but that it had not been done, in consequence of finding his compass out of order.

6th: In addition to these documents, there were before the commissioners the depositions of Auguste Chouteau and J. B. Provenchere, conducing to show a claim and user of a common, by the villagers of Carondelet, as far back as 1770.

On the 2d of January, 1812, the board of commissioners rejected this claim.

In addition to these proceedings before the board of commissioners, there was given in evidence, on behalf of plaintiff, a plat and notes of a survey, made by Joseph C. Brown, in March, 1834, in pursuance of instructions from the surveyor-general's office, dated February 10, 1834. This survey was a continuation of the western line, as commenced, or supposed to be commenced, by Soulard in 1797, and embraced $9,905\frac{29}{100}$ acres.

Joseph C. Brown was also introduced as a witness in relation to said survey, and stated, that he found marks of an old survey, but not a Spanish survey, below the river Des Peres; also gave it as his opinion, that to run a line parallel with the Mississippi, means a line parallel to the general course of said river; and to run such a line, he would, to embrace the quantity called for, run it parallel to the general course of the river, making due allowance for the loss on the east, occasioned by the windings of the river; but that it was his opinion that the expressions in Trudeau's grant called for an extension of the western line of the common-field lots, and so he had made the survey, and had, in this respect, acted in conformity to the instructions of the surveyors general.

William Milburn, who had been a surveyor-general under the federal government, at St. Louis, also testified, that the extension of the line below the river Des Peres had been originally run by Elias Rector. Witness gave his opinion in relation to the proper construction of the words, " parallel to the Mississippi," which corresponded with that of Brown; but stated, that if he had been directed to make the survey, he would have made it as Brown did, because it had been so commenced by Soulard, under the Spanish government. Witness also stated, that Brown's survey had been rejected by the commissioner of the general land-office, but no other survey had been made.

The plaintiff also gave in evidence the plat and field notes of a survey made by Elias Rector, some time before 1817, and filed in the surveyor-general's office.

The plaintiff also introduced in evidence, proceedings before the board of commissioners and recorder, in relation to six claims, which, by the plats given in evidence on the trial, appeared to be within the claim of commons, as surveyed by Joseph C. Brown and E. Rector.

1st. The claim of Julien Chouquette to 640 arpens. This claim was brought to the notice of the recorder of land titles in 1808, and was founded on improve-

ments, cultivation and inhabitation, from 1798 till 1803, and was confirmed under the second section of the act of Congress of 3d March, 1807.

2d. The claim of Gabriel Constant to 35 arpens. This was a concession of Lieutenant-governor Trudeau on September 4th, 1795, and it was surveyed by Soulard on 15th April, 1796: it lies entirely north of the river Des Peres. This claim was rejected by the board of commissioners in 1814, but was afterwards recommended for confirmation by the recorder of land titles in 1813, and confirmed by act of 29th April, 1816.

3d. The claim of Gabriel Cerre. This was a concession from Manual Perez, on March 15th, 1789, upon conditions that it was improved within a year from the date of the grant. This claim was rejected by the board of commissioners in 1811. In 1833, it was recommended for confirmation, and confirmed by the act of July 4, 1836.

4th. Pierre Delor de Treget. This claim was filed with the recorder in 1812. It was a petition to Lieutenant-governor Trudeau for 400 arpens on the Gravois, and on the 6th December, 1796, the lieutenant-governor ordered the surveyor to put De Treget in possession, provided the land belonged to the king's domain, and was prejudicial to no one. This was surveyed, for the first time, by Joseph C. Brown, in May, 1821, and was confirmed by the act of July 4, 1836.

5th. J. B. Martigny. This claim was 12 arpens in front, and founded on a concession from Lieutenant-governor Cruzat in 1783, and confirmed by act of Congress of July 4, 1836.

6th. The claim of Sophia Bolaye, *alias* Boli, was filed with the recorder of land titles in 1812. It was founded on a petition to Lieutenant-governor Trudeau in 1796, for 150 arpens, to which the lieutenant-governor replied, by ordering the surveyor to put her in possession of the land prayed for, provided it was a part of the king's domain. This was surveyed, for the first time, in 1821, by Joseph C. Brown, and was confirmed by the act of 1836.

The plaintiff also introduced the proceedings before the board of commissioners on the claim of Eugenid Alvarez, which embraced 462 acres 12½ perches, granted by Trudeau in 1796, and confirmed in 1812, and the claim of John Colgin to 403 arpens, granted by Trudeau in 1797, with a view to show, from the papers filed in support of said claims, a recognition of the existence of a common south of the river Des Peres.

The plaintiff also proved, by one Pierre De Lor, that he was present when Soulard run the lines of the commons in 1796; that Soulard commenced at the south-west corner of the common fields of Carondelet, and run southwardly to the river Des Peres, and went no further, because of rain and high water.

The defendant gave in evidence, the instructions from the commissioner of the general land-office, dated January 20, 1841, to William Milburn, surveyor-general, enclosing an opinion of the solicitor of the treasury, and a copy of a communication from the secretary of war — from which it seemed, that the officers above named did not approve of the survey of Joseph C. Brown, and directed a survey to be made, so as to give the 6000 arpens claimed by the inhabitants of

Carondelet, but without interfering with private claims, or the 1700 acres reserved by government for the barracks.

The defendant also gave in evidence the plat and field notes of the claim of Gabriel Cerre, under which he held, and which was confirmed by act of Congress of 4th July, 1836.

The court instructed the jury, at the instance of the plaintiff, that "The act of Congress, approved June 13, 1812, entitled, 'An act making further provisions for settling the claims to land in the territory of Missouri,' and the act of Congress, approved 27th January, 1831, entitled, 'An act further supplemental to an act, entitled, 'An act making further provisions for settling the claims to land in the territory of Missouri,' passed 13th June, 1812, confirmed to the inhabitants of the village of Carondelet, *alias* Vide Poche, all the land lying south of the common fields of Carondelet and the village of Carondelet, and between the Mississippi river and a line run from the south-west corner of said common fields, south 28° west, and extended same course one hundred and fifty arpens, saving and excepting therefrom all claims, theretofore confirmed by the board of commissioners, for adjusting and settling claims to land in the territory of Missouri, and all complete grants within the same limits, made by the French or Spanish governments, while those governments respectively had possession of this country, and such confirmation takes effect from the approval of said acts of Congress."

Other instructions were given, but the above appears to embrace the point upon which this controversy mainly depends.

It was conceded, that the claims to commons, made by the village of Carondelet, as well as the other villages enumerated in the act of 13th June, 1812, were confirmed by that act; but in this case it is contended, that the claim was indefinite, not set forth by metes and bounds, and consequently, until some further action on the part of the government, no particular tract can be claimed, by virtue of the act, upon which the inhabitants can maintain ejectment. The whole question, then, resolves itself into this : was there a claim to a specific quantity of land, by metes and bounds, brought to the knowledge of the federal government or its officers, before the passage of the act of 13th June, 1812, and upon which that act could operate ?

In the case of Bird *vs.* Montgomery, (6 Mo. Rep., 510,) and Mackay's Heirs *vs.* Dillon, (7 *Ibid.*, 8,) in which the titles to the St. Charles and St. Louis commons, under the act of Congress above named, were investigated and passed upon by this Court. The principles upon which that act must be construed were considered and decided. It was the design of Congress, according to the construction there given to this act, to confirm the *claims* of these villages, as they were presented to, and acted on, by the board of commissioners of land claims in Upper Louisiana, without reference to the merits or demerits of the original Spanish title.

In this view of the subject, it cannot be material to inquire into the character of the concession by Trudeau, in 1796.

Whether the expressions of the lieutenant-governor, in declaring that land

within certain limits could not be granted to individuals, because it had been reserved for the supply of the necessary wood to the village, are to be regarded only as indications of a design, at some future time, to make a definite grant, or whether the answer to Gamache must be viewed as a grant to the extent therein specified, so far as the lieutenant-governor had the power to grant, might have been material questions in an inquiry into the validity and extent of this concession, under the laws and usages of the Spanish government. The act of 1812 precludes all such investigations; it relinquishes the title of the United States to such commons as were claimed, without reference to the strength of the claim, which might have been set up under the Spanish authorities.

The report of the board of commissioners was sent to Washington, early in the winter of 1812, and it was accompanied by two official letters from one of the commissioners, addressed to the secretary of the treasury, and a letter from the secretary of the board, (T. F. Riddick) addressed to the chairman of the committee on public lands. These letters are published in the American State Papers, vol. 2, pages 377, 8, 9. (Duff Green's edition.) The claims of villages to their commons are placed by Mr. Penrose, (the commissioner referred to) in his communication to Mr. Gallatin, dated March 20th, 1812, in the ninth class, and in relation thereto he says, "The ninth class ought to be confirmed; they would have been under every practice we have seen. Had the Spanish government continued the possession, usage and custom, according to our construction, could not have existed in that country." In his letter of the 24th of March, he classes claims to commons under the fifth class, and in relation to the five classes, he says—"As I presume the intention of our government must be, to do such justice to their newly-acquired citizens as would have been by that government of whom they were purchased, there can be no hesitation in confirming or granting such claims as are comprehended in the five foregoing classes." In a communication by T. F. Riddick, secretary of the board, dated March 26th, 1812, and addressed to the chairman of the committee on public lands, Mr. Riddick classes the claims to commons, common fields and lands adjacent, in the 49th class, and says, in relation to that class—"The 49th class will comprise nearly one-fourth in number of all the claims in the territory of Louisiana, and, if confirmed at once by the outer lines of a survey, to be made by the principal deputy, would give general satisfaction, and save the United States a deal of useless investigation into subjects that are merely matters of individual dispute. The United States can claim no right over the same, except a few solitary village lots, and inconsiderable vacant spots, of little value, which might be given to the inhabitants for the support of schools." American State Papers, vol. 2, p. 379.

These communications, whilst they could not be permitted to control, in anywise, the plain meaning and intent of the act, which was reported by the chairman of the committee on public lands, to whom one of them had been addressed, and which was passed into a law on the 13th day of June following, may yet be referred to, in connection with that act, as corroborating the construction which its language bears, and which was, as has been stated, placed upon it in the two cases already determined by this Court. Congress appears to

have acted in conformity to these suggestions, and accordingly confirmed the "*rights, titles and claims* to town or village lots, out-lots, common-field lots, and *commons,*" belonging to the several villages enumerated in the act.

The inquiry, then, which must determine the rights of the parties to this suit, must be confined to the claim which was made by the inhabitants of Carondelet, on or before the 13th of June, 1812. What was this claim?

In 1808, this claim was notified to the recorder, as a claim for 6000 arpens, "by virtue of a concession from Don Zenon Trudeau, lieutenant-governor, dated 7th December, 1796."

This notice was accompanied by the concession, which appears to be contained in an answer of the lieutenant-governor, Trudeau, to the petition of one Gamache, for land adjoining the village common fields, for the purpose of cultivation. In this answer, the lieutenant-governor declares, that the land petitioned for could not be granted, as it was reserved for wood for the inhabitants, nor could any other concessions take place, (*avoir lien*) in the direction of a line taken from the end of the common-field lots, and running parallel to the Mississippi, one hundred and fifty arpens lower down. In addition to these papers, there was filed before the board of commissioners a plat of survey, made in the year following the date of the concession, (1797) by the Spanish surveyor, Soulard, and purporting to have been made by directions of the lieutenant-governor, at the instance of the commandant of the village, and in the presence of the villagers. This survey ascertained the western line of the commons, no further than the river Des Peres, which was distant 23 arpens 3½ perches from the south-west corner of the common fields — but the survey purported to be made under the decree of the lieutenant-governor, dated 7th December, 1796.

There was also before the board the certificate of Soulard, made in 1806, the purport of which was, that he had been called upon to finish his survey of the commons, but, from accidental causes, it had not been done. By order of the board, it was also ascertained, from a survey made by Joseph C. Brown, that the distance from the S. W. corner of the common fields to the river Mississippi was forty-eight arpens.

Upon these documents, one of three constructions must prevail:

1st, That the commons, as surveyed by Soulard, north of the river Des Peres, and so much more taken in the direction of the line described in the decree of the lieutenant-governor, as will make the 6000 arpens claimed, must be regarded as the extent of the claim confirmed; or,

2d, That the *quantity* of 6000 arpens must be rejected as description, and the claim be considered, as embracing the whole tract contained within the line running S. 28° W., one hundred and fifty arpens from the S. W. corner of the common fields; or,

3d, The whole claim must be considered as a floating claim for 6000 arpens of land, to be subsequently located, and neither was any common north or south of the river Des Peres, distinctly and definitely claimed, and none, therefore, was by metes and bounds confirmed by the act of Congress.

The last supposed construction of this claim has not been seriously contended

for, either in the argument of this case or in the opinions of the various officers of the federal government, which have been given adversely to this claim, and it may therefore be rejected, as without any foundation. The act of 1812 was not a donation of land, or a mere grant *de novo*. Though, by virtue of that act, the title of the United States is extinguished, it is a recognition of claims, rights and titles, previously in existence, originating under the former government, and which, from motives of sound policy, as well as good faith, this government was induced to confirm. By no fair construction of this law can it be for a moment believed, that this government intended to grant to the town of Carondelet, from motives of mere munificence, a tract of 6000 arpens, to be located wheresoever the caprice of the inhabitants, or of Congress, might suggest.

If the act operated at all, it confirmed a known and ascertained claim — a tract already designated and fixed, leaving nothing for the future action of the government or the claimants. This was clearly the design of the act; it may have failed, because of the uncertain and indefinite nature of the claim supposed to be confirmed; but this, if it be so, was not the fault of Congress, and can be no ground for imputing to them the design of donating to any of their villages a certain quantity of land, without any fixed location.

The first supposed construction of the claim may be considered in two aspects; first, as a claim limited to the tract north of the river Des Peres, and founded, therefore, entirely upon Soulard's survey, without regarding the quantity claimed or the decree of the lieutenant-governor; and secondly, as a claim to the land embraced by Soulard's survey, and so much more taken in the direction of the line, as described by Trudeau, as will be necessary to complete the 6000 arpens. This last appears to be the view entertained by the solicitor of the treasury, and sanctioned by the commissioner of the general land-office, as appears from their official opinions, given in evidence before the Court of Common Pleas, by the defendant below. The first construction seems to be the one most strongly insisted on by the counsel, who argued for the plaintiff in error. I regard both these constructions of the claim as unfounded and unwarranted.

The papers filed before the board of commissioners afford satisfactory and conclusive proof, that the claim of the inhabitants of Carondelet was not confined to the survey of Soulard.

The amount claimed seems, of itself, to exclude such a supposition. The board of commissioners ascertained the distance from the S. W. corner of the common fields, to the Mississippi, to be 48 arpens.

If the course of the river Des Peres had been parallel, or nearly so, to the southern line of the common fields, it was manifest that the land embraced in Soulard's survey would not much exceed 1100 arpens. It is to be presumed, however, that the inhabitants were aware of the general course of this stream, and must have known, that the quantity lying between that river, (the Mississippi,) the southern line of their common field and village, and the western line run by Soulard, could not much exceed 2000 arpens.

But, apart from this, the survey of Soulard does not purport to be a complete survey; it professes to be a survey of a common, granted by a decree of the

lieutenant-governor, of the 7th December, 1796; and instead of running the western line 150 arpens, as called for by that decree, it establishes the line no further than 23 arpens 3½ perches.

The subsequent certificate of Soulard, in 1806, confirms this construction of his survey, and it is impossible to entertain the belief, that the commissioners of the federal government, who had before them the survey and subsequent certificate of Soulard, and who investigated and rejected this claim, considered it as a claim only for so much commons as had been surveyed by Soulard.

These two supposed constructions of the claim upon which the act of 1812 operated, which have been insisted on in the argument, it is quite apparent, afford the only plausible grounds upon which the Court could be justified in disregarding this claim; for, if it be conceded, that the land surveyed by Soulard was confirmed by the act, and so much more as might be necessary to make up the quantity claimed, to be taken in a line, designated in the decree of Trudeau, it seems to be a concession of the whole claim, as surveyed by Brown.

The only uncertainty in the decree of Trudeau, is in ascertaining the direction of the line mentioned in his decree, and the point from which that line was to start.

If these two ambiguities be removed, there can be no possible difficulty in ascertaining the entire boundaries. If, then, the survey of Soulard be admitted, and regarded as confirmed, it must follow, that his survey rendered that line and starting point fixed and certain, and a complete survey of the tract confirmed would be nothing more than a continuation of this line, to the extent designated in the lieutenant-governor's decree.

This, I have no doubt, is the proper construction of the claim. Whatever uncertainty there may have been in the description of this western boundary of the commons, has been removed by the survey of the Spanish officer, made within less than a year from the date of the decree. It is no longer a proper subject of inquiry, what is a line parallel to the Mississippi, or what point is meant by the words, "*a bout des terres du dit villages,*" since the point and the line were both ascertained and fixed by the proper officer of the Spanish government, under the eye of the commandant, and the construction thus placed upon the language of the decree was sanctioned by the constituted authorities, from 1797, until the transfer of Louisiana, in 1804.

The idea which appears to be entertained now, that this line may be corrected and run, in conformity to what is conceived to be the correct exposition of Trudeau's grant, so as to embrace the quantity of land claimed by the inhabitants, without interfering with the claims, either of the government or of individuals, seems to be an after thought, and rather a question of future policy, than a judicial interpretation of past legislation. Such arguments and views can have no proper influence in determining what has been already confirmed by the acts of Congress. Either the claim, granted by Trudeau, in 1796, was confirmed, or it was not. If not, it may be a suitable matter for the consideration of the federal government, how far they will *now* recognize this claim; but if it has been confirmed, to its

full extent, it only remains for this Court to pronounce accordingly, without regard to the prudence or justice, or expediency of such confirmation.

An argument, in opposition to this claim, has been drawn from the fact, that six private claims lie within the limits of the supposed commons, which have all been confirmed.

A complete answer to this objection is, that it only applies to the original concession under the Spanish government. It relates exclusively to the merits of the Spanish title, and might have been urged in opposition to a confirmation of this title by Congress, but is entitled to no weight in ascertaining the true meaning and extent of the confirmation made in 1812. Congress, we may reasonably suppose, carrying out the liberal policy which had prevailed under the former government, did not look very narrowly into the merits of the claims which they confirmed. This claim, as well as the claims of St. Charles and St. Louis, had been rejected by their board of commissioners, and this rejection was, of itself, sufficient to advise them that doubts hung over their genuineness and validity. Such considerations, however, were overlooked, and, desirous of strengthening their newly acquired citizens in their attachment to this government, and of giving them proof, not only of their justice, but of their generosity, they relinquished all their title by the act of 1812, and placed them in a situation which would require them to contend only with private claimants, if any adverse claims existed.

It is, moreover, to be observed, that the Spanish authorities always made their grants upon condition that the lands petitioned for were a part of the public domain, and generally upon conditions, that they were improved within a limited time. No settlements were made without permission from the Spanish officer, and these permissions or concessions were almost a matter of course, but the claimant was not put in possession, if an adverse possession or claim previously existed, or if the land had been previously severed, in any way, from the king's domain. Of the six claims, included within the limits of the Carondelet commons, one is of American origin, and the remaining five, with one exception, originated anterior to the decree of Trudeau, in 1796. It would seem, from the decree of Trudeau, that the existence of these claims was not unknown to him; for he declares that the claims conceded, or concessions granted, (*concessions, accordees*) within the limits decreed for commons, could not take place, (*avoir lien*) or in other words, would not be perfected into grants. How can any inference be drawn from these claims, which were not confirmed by Congress, with two exceptions, until 1836, unfavorable to the confirmation of 1812?

My inference, then, from the documents filed with the board of commissioners, is, that the claim was for a specific tract of land, designated by metes and bounds; and that, upon well settled principles of law, the quantity claimed, cannot be permitted to control, when specific boundaries are fixed; that whatever ambiguity there may have been in the decree of the lieutenant-governor, in relation to the western line mentioned in that decree, was removed by the survey made by his authority in 1797, and this survey being before the board, and communicated to Congress, was sufficient to apprise Congress of the extent and boundaries of the

*Dent* vs. *Bingham.*

lands claimed; and that the act of 13th June, 1812, confirmed the commons to the full extent claimed before the board, by virtue of the decree aforesaid.

In my opinion, therefore, the first instruction given by the Court of Common Pleas was correct, and its judgment should be affirmed.