Mr. Justice Miller
delivered the opinion of the court:
The subject of this controversy is the title to the land known as Jefferson Barracks, consisting of about seventeen hundred acres, five miles below the city of Saint Louis. It lies within the lines of a survey of the commons of Carondelet, containing a much larger quantity — nearly 10,000 acres.
The present suit was instituted in the Court of Claims in 1859 by the city of Carondelet. As the jurisdiction of that court was doubted, Congress, by the act of 1873, (17 Stat., 621,) specially authorized it to entertain jurisdiction of the controversy. The city of Carondelet having become merged in the city of Saint Louis, by an act of the legislature of Missouri, the latter city was substituted as plaintiff.
A deed conveying the land in controversy to the United States was made by the city of Carondelet on the 25th day of October, 1854, and it is not controverted that the authority under which this was done was sufficient. And if this deed be held to be otherwise valid, it decides the controversy in favor of the United States. Its validity is denied, however, on *413 tbe part of plaintiff, on the ground that it was without consideration, and that it was improperly coerced from the authorities of Carondelet by the officers of the Government who had charge of the department of public lands, by an unjust and illegal exercise of authority in refusing to confirm, and threatening to set aside, the survey which we have already mentioned, of the Carondelet commons, and exacting this deed as the condition of their acquiescence in that survey. On the other side, the deed is supported as a just and equitable compromise of a long-existing controversy, both as to the correctness of that survey and the right of the Government to the ground known as Jefferson Barracks.
The origin of the claim of Carondelet was a concession of 6,000 arpents of land adjoining the village, made in 1796 by Zenon Trudeau, lieutenant-governor of Upper Louisiana. An attempt to give locality to this concession was made by Soulard, (who describes himself as a surveyor commissioned by the Government,) in December, 1797, but the first actual- survey was made in 1818, by Elias Eector, who was deputy under his father, William Eector, surveyor of public lands for the Territories of Illinois and Missouri.
The Court of Claims finds that, though the field-notes of this survey were filed in the surveyor’s-office, it was never approved by him.
But in the year 1834, Elias T. Langham, surveyor-general at Saint Louis, caused J. 0. Brown, one of his deputies, to retrace and re-establish the lines of Sector’s survey, and when the result of the work was returned to his office he approved the survey, and the same was duly filed in the office of recorder of land-titles in Missouri, who thereupon certifies that the title was by him duly confirmed of the village to their claim as commons of 6,000 arpents of land, as shown by that survey. Six thousand arpents are equivalent to 5,104 acres. The survey contained 9,905 acres, and the Court of Claims find that after deducting from that quantity the Jefferson Barracks claim and all private claims, there still remained nearly 1,000 acres more than the 6,000 arpents. There is no evidence that this survey was ever brought to the attention of the Land Department in Washington until June, 1839.
In that year the surveyor-general at Saint Louis seems to have called the attention of the district attorney of the United States *414 for Missouri to the survey in connection with the location of Jefferson Barracks, and the letter having been transmitted to the Secretary of War, an investigation of the whole matter was instituted by the Commissioner of Public Lands.
This resulted in an order made in 1841, by Commissioner Whitcomb to Surveyor-General Milburn, directing a new survey of these commons, on the principle of reserving 1,702 acres for military purposes at Jefferson Barracks, allowing 6,000 ar-pents to Oarondelet for her commons, and restoring the balance, not covered by private claims, to sale as public lands.
It may as well be here stated that this order was never carried out.
In the year 1826 the military authorities of the United States, desiring to establish at that point a military post, procured from twelve inhabitants of the village of Oarondelet a deed conveying to the United States a described portion of the land which they claimed as part of the commons of the village, with a reversion to the village whenever -the United States should cease to use it for military purposes. From that time the Government has been in continued possession of the property.
It appears, by the findings of the court, that certain persons who had purchased lots of the city of Oarondelet, not conflicting with the barracks claim, and other citizens of Oarondelet, becoming uneasy about the condition in which the title to all the commons was left by the order of Commissioner Whitcomb, employed agents to procure a confirmation of the Brown-Bector survey. They appeared at Washington and a negotiation, remonstrance, and correspondence was carried on for several years, and divers opinions and decisions were had from Commissioners of the Land Office and Secretaries of the Treasury and Interior, none of which confirmed the survey as valid.
■ Finally, without any suggestions shown to come from the United States or its officers, the parties interested in the settlement of the title of Carondelet to the remainder of the commons, and the authorities of that city, conceiving that, if the title of the United States to that reservation was made good, the main difficulty in the way of this settlement would be removed, the authorities of the city made the deed we have already mentioned of October, 1854.
And, accordingly, on the 8th of October, 1855, another survey on the basis of Brown’s, but marking the barracks prop *415 erty as reserved, and giving its boundaries, was made and confirmed by the Commissioner of the Land-Office as the true survey of the Carondelet commons.
It is obvious enough from this imperfect sketch of the history of the controversy that the deed of the city to the United States and the subsequent confirmation of the survey were the result of a compromise of a long-pending contest between the parties to it. No fraud is found or suggested. The action of the city of Carondelet cannot be impeached on the ground of duress within any legal or equitable definition of that term as applied to contracts. It was a suggestion originating with Carondelet, designed to secure action which she desired. The officers of the Land Department were doing nothing in the matter. The order for the new survey, made in 1841, had never been executed, and, in 1845, Commissioner Shields had declared that there was no intention to carry that order into effect until further action by Congress, and this was repeated by Commissioner Young, in 1846.
If, as is now argued, Carondelet had a perfect title to the land in controversy, she had nothing to do but remain quiet or assert her title in the courts of law, which were open to her, for no officer of the Government, from 1841 to the date of this deed, a period of thirteen years, did anything to affect that title or to deprive her> of her rights.
But the opinion of all the officers of the Land Department was againt the validity of that survey, and of course against her title to any commons at all as being perfect. The supreme court of the State of Missouri had so decided in 1844 in the case of Dent v. Bingham, (8 Mo. R., 579.) It was known that the survey included nearly twice as much land as was originally claimed under the grant of Trudeau.
The Land-Office, while it declined to exercise it, had asserted the right to set aside that survey and order another, and was apparently only awaiting some action of Congress.
How can it be said under these circumstances, after a contest of thirteen years, that Carondelet, in proposing to release her claim to the 1,700 acres of the barracks reservation, in exchange for the quieting and perfecting of her title to the remainder of the commons, acted under duress 1 Or acted unwisely ? Or that the- compromise was as to her inequitable ?
It is said to be inequitable because it is now the settled law *416 that, under the act of 1812, confirming the titles of the villages to their common lands, the title became perfect on the completion of the survey.
And we are not disposed to deny the doctrine, that when such a survey was made by the proper officers in 1839, and approved by the surveyor-general, such a survey constituted a title to the land.
But this doctrine was not so completely and fully settled at the date of this compromise as to be free from doubt. And if it were, there still remained the question of the power of the Commissioner of the General Land-Office to set aside a survey so made and order another — a power which undoubtedly exists as to all surveys made for many years past, however it may have been in 1841.
But it is important to consider that the Land Department then asserted such a power, and no decision had then settled the law to the contrary. It was, therefore, a proper element of doubt in considering the question of a compromise.
If, however, the Commissioner had no such power, and conceding that the approval of that survey by the surveyor-general completed the legal title to the land it included, there can be no doubt of the right of the United States, treating the same as if it were a patent, to file a bill in chancery to set it aside as improvidently made, and on the trial of this issue, the excessive quantity of the survey, the .reservation and long possession of the.barracks, and perhaps other circumstances, would have made the result doubtful enough to justify the authorities of Carondelet in compromising the matter in advance of such a suit.
In short, we are of opinion that the deed of Carondelet is valid, as based upon an equitable compromise of a long-pending and doubtful question of title, and that it excludes the plaintiff in this suit from any relief.
The j udgment of the Court of Claims is accordingly affirmed.