## ILLEGAL ACQUIREMENT OF STREETS FOR RAILWAY PURPOSES.

Circuit Court of Cuyahoga County.

THE CLEVELAND & PITTSBURG RAILROAD COMPANY ET AL V. CITY OF CLEVELAND ET AL. *

Decided, January 17, 1910.

*Streets—Form of Action for Recovery of Possession of, by a Municipality—Irregularities in Dedication—Sufficiency of—Doctrine of Stare Decisis Applicable—Effect of Power in City Charter to Establish Boundaries of Streets—Inconsistent Use of—Limitations as to Occupancy of, by Railways—Ineffectual Attempts by Municipality to Part with Title to—Statute of Limitations Does Not Run as to Nuisances Placed in—Equitable Estoppel Without Application Against Municipality—Competence of Evidence as to Permissive Occupation by Railway Tracks—Dicta of Supreme Court Inconsistent with Later Decisions Not a Basis for Property Rights—Governmental Functions Can Not be Impaired by Compromise Agreements.*

1. To recover possession of a city street an action for the recovery of real property, under Section 5781, Revised Statutes of Ohio, is maintainable by such city, if it be otherwise entitled to the immediate possession and control of the street in question, whatever be the exact legal nature of its estate or interest, and despite any easement of the defendants for railroad purposes therein.

2. Irrespective of any irregularities in the dedication of the original streets of the city of Cleveland, their long and uninterrupted use and enjoyment by the public for nearly half a century before the defendants' use of the one here in question began, raises a presumption that such street was in early days, laid out and established by competent authority; and the conclusiveness of such presumption is emphasized by the further circumstance that the actual sufficiency of the dedication of all said original streets was long ago so settled by repeated adjudications as to be *stare decisis.*

* Affirmed without opinion, *Cleveland & Pittsburg Railway Co.* v. *Cleveland,* 87 Ohio State, p. —.

3. Inasmuch as it is not and never has been in the power of the Legislature, unless in the exercise of the power of eminent domain, to authorize property dedicated to the public for a specific purpose to be used for any other and inconsistent purpose, it is immaterial what limitations the city of Cleveland in early days sought to place upon the public use for street purposes of one of its dedicated streets, or to what other purposes it may have sought to divert it, either with or without color of legislative authority.

4. The power conferred by Sections 6 and 8 of the first city charter of the city of Cleveland (34 Ohio Laws, 271), to settle and establish the boundaries of its streets and to make maps and surveys thereof that should be conclusive evidence of the position and limits of such streets, is to be construed as a power in substance to ascertain, not to alter street boundaries, and to establish the existing location of streets, not to abandon or vacate them.

5. It is not and never has been within the delegated powers of the city of Cleveland to part with its title held by dedication in trust for the public, to its properly established and opened streets otherwise than by compliance with the provisions of statutes expressly providing for their vacation or their appropriation to a paramount public use.

6. Section 11 of "an act regulating railroad companies" (46 Ohio Laws, 40), and the substantially similar provisions of Section 3283, Revised Statutes of Ohio, authorizing railroad companies, in the exercise of the power of eminent domain by agreement with municipalities or by action for appropriation, to acquire the right to use and occupy public streets, when necessary in the location of their railroads, do not authorize the acquisition by such companies of an exclusive and permanent estate or easement, but of a right merely to the joint use and occupancy with the public, of lands already dedicated or appropriated to public use for street purposes; and this right is exercisable only in such manner as shall not destroy the street, nor exclude the public use and enjoyment of any and every part of it, nor cause any nuisance therein, nor interfere with the full control and supervision thereof by the municipal authorities.

7. The placing by railroad companies upon city streets of permanent structures that prevent the public use of all or part of such streets, being unauthorized by statute, constitutes the maintenance of public nuisances, in favor of which the statute of limitations does not run; especially if such structures when so placed were claimed by such railroads, however mistakenly to be subservient to the public use to which the premises had been dedicated as a street, and pursuant to a lawful agreement with such city to that end.

8. The doctrine of equitable estoppel has no application in aid of the validity or extent of a grant to a railroad by a municipality of its streets, where there is an entire absence of power to make such grant originally.

9. Where, in an action of ejectment brought by a city against railroad companies to recover possession of a city street, the defense of the statute of limitations is interposed by one of said companies in aid of its color of title imperfectly derived from a source paramount to that of the city, an answer filed by such company in an action to which said city was not a party and at a time when the alleged running of the statute of limitations was but just begun, averring that said company occupies the land in controversy by permission of and agreement with such city and in harmony with the street purposes for which said land was originally dedicated, is admissible in evidence, not as tending to prove any tolling of the statute of limitations, but as characterizing the said defendant's possession as permissive and consistent with the original public use.

10. The fact that various *dicta* in the opinions of judges of the Supreme Court of Ohio, touching the proper construction of Section 3283 of the Revised Statutes of Ohio, are prior to and inconsistent with the first formal decisions by the same court upon that subject, affords no basis for the application of the rule of property that rights founded upon the adjudicated construction of a statute can not be swept away by later contrary decisions.

11. The implied authority, in all corporations with the power of suing and being sued, to compromise and settle matters of *bona fide* dispute or limitation to which they are parties, does not extend to the destruction or impairment of any governmental function of a municipal corporation (such as its duty to keep its streets open, in repair, and free from nuisance), by its alleged compromise settlement of a litigated title to one of its dedicated streets whereby it is claimed to have surrendered its title to a substantial part of such street; especially when its adversaries in such litigation are not parties to the alleged settlement of the consideration therefor, and are not concluded thereby.

*Squire, Sanders & Dempsey,* for plaintiffs in error.

*Newton D. Baker,* City Solicitor. *Cook, McGowan & Foote* and *James Lawrence,* contra.

HENRY, J.; MARVIN, J., and WINCH, J., concur.

Error to court of common pleas.

This proceeding in error is brought to reverse the judgment rendered by the Cuyahoga Common Pleas Court in behalf of the plaintiff below in an action of ejectment begun by the city of Cleveland, under favor of Section 5781, Revised Statutes, to recover possession from divers railroad companies, defendants below, of the greater part of street on the lake front between the Cuyahoga river and the Union Station in said city.

The court below found:

"That the plaintiff has a legal estate in and is entitled to the immediate possession of, the premises described in the petition, subject to all the rights which the defendants herein, and each of them, have in and to said premises, under and by virtue of a contract dated September, 1849, by and between the city of Cleveland and the Cleveland, Columbus & Cincinnati Railroad Company," etc.

This judgment fails to define the rights of the defendants below thus reserved in such manner that a writ of restitution may discriminate what is to be restored to the city from what is not. Inasmuch as the controversy turns on the extent of the rights conferred upon the defendants below by the contract of 1849, the judgment begs the very question at issue.

Passing by this question, however, for the present, we hold, at the outset, that ejectment by the city to recover possession of its street is, however its estate or interest therein be defined, and despite any easement of the defendants below therein, a remedy both fitting and adequate. *Paige* v. *Cherry,* 17 C. C., 579, 582 (52 O. S., 644); *Fulton* v. *Mehrenfeld,* 8 O. S., 440 (1 Disney, 151; 2 Handy, 17); *City of St. Louis* v. *Mo. Pac. Ry. Co.,* 114 Mo., 13.

Nor will we indulge any doubt as to the original validity of the city's title to this street as such. Its long and uninterruped use and enjoyment by the public for half a century before the defendant's use began, would raise a conclusive legal presumption, were resort thereto required, that this street was at some anterior

period laid out and established by competent authority. *Railroad Co.* v. *Roseville,* 76 Ohio St., 108, 117.

All the original streets and public grounds of Cleveland are in like case, ·and the sufficiency of their dedication was long ago settled by repeated adjudications, both reported and unreported, and is therefore *stare decisis. Holmes* v. *R. R.,* 8 Am. Law Rep., 716; *City of Cleveland* v. *Ry. Co.,* 93 Fed., 113; *Gleason* v. *Cleveland,* 49 Ohio St., 431.

Inasmuch, moreover, as it is not and never has been in the power of the Legislature, unless in the exercise of the power of eminent domain, to authorize property dedicated to the public use for a specific purpose, as in this case, to be used for a purpose inconsistent with that for which it was dedicated, it is immaterial what limitations the city sought to place upon the public use of said street for street purposes, or to what other purposes it may have sought to divert it, either with or without legislative authority during that early period. *L. & N. Railroad Co.* v. *Cincinnati,* 76 Ohio St., 481; *Board of Education of Van Wert* v. *The Inhabitants et al,* 18 Ohio St., 221; *LeClercq et al* v. *Trustees of Gallipolis,* 7 Ohio (part 1), 217.

Suffice it to say that in the very contract, already alluded to, the parties themselves have referred to and characterized the premises in controversy, including much of the present large littoral accretion, as being at and prior to the date of said contract, a street of the city of Cleveland.

The city had always recognized the street as such; and the equivocal phrases in the early municipal records, "Bath street, so-called," and "land known as Bath street property," are referrable not to any uncertainty as to its legal status, but to the anomalous littoral boundary and variable width. It is true that, pursuant to the provisions concerning streets contained in the city's charter, enacted March 5, 1836 (34 O. L., 271), as amended by the act (irreconcilable, by the way, with the above decisions), passed December 21, 1844, the city council had, with respect to said premises, availed themselves of the qualified "power to lease any portion, or portions, of said streets, not in their opinion re-

quired for public use.'' The so-called Merchant Map, which the council procured and put on record, in order to facilitate such temporary leasing, and which distinguishes the portions of Bath street allotted for that purpose from the residue then deemed to be required for public use and travel, was plainly not intended to be ''conclusive evidence of the position and limits of such street,'' nor to ''settle and establish the boundaries'' thereof, under Sections 6 and 8 of the charter, in such manner as permanently to exclude from public use the premises in controversy. The power conferred by those sections is to ascertain, not to alter street boundaries; to establish the location of streets, not to abandon them. The settling of street boundaries is not a method available for vacating the major part of a street or for deliberately extinguishing the dedicated public use of any portion thereof.

There is no pretense here that the disputed part of Bath street was ever formally vacated, in compliance with the provisions of any statute expressly adapted to that end. As stated in *Lake Shore & Mich. Southern Ry. Co.* v. *City of Elyria,* 69 Ohio St., 414, 429:

''We find nowhere any other method of vacating such public highway, or any part of it. By the proper establishment and opening of the street the village or city becomes vested with the full title thereto, in trust for the public, and it is not within the delegated powers of the municipal council to barter or grant away such title, except in the mode provided for the purpose.''

The strength and character of the city's ancient title being thus beyond question, what grounds had the defendants below for withholding possession of the premises? The answers plead the following contract, which admittedly inures to all the defendants, and binds the city so far as it had power so to contract:

''This indenture, made this thirteenth day of September, in the year of our Lord eighteen hundred and forty-nine, by and between the city of Cleveland, by F. W. Bingham, mayor of said city, thereunto duly authorized by resolution of the city council of said city, party of the first part, and the Cleveland, Columbus

& Cincinnati Railroad Company, by John M. Woolsey, vice-president thereof, thereunto duly authorized by resolution of the board of directors of said company, party of the second part, WITNESSETH:

"That said city of Cleveland, in consideration of the sum of fifteen thousand dollars, received by said city of said railroad company, in the capital stock of said company, for which a certificate for one hundred and fifty shares, of one hundred dollars each, full paid of said stock, hath been issued to said city, the receipt whereof is hereby acknowledged, and also in consideration of the covenants of said railroad company hereinafter contained, hath granted, and by these presents doth grant to said railroad company as fully and absolutely as said city or the constituted authorities thereof, have the power or legal authority so to do, the right to the full and perpetual use and occupancy for their railroad tracks, turn-outs, engine and car and passenger houses, turn-tables, water tanks, or stations, avenues to and from the same, leaving open spaces between when deemed expedient, and other purposes connected with, and necessary for the convenient use and working of said road, all of Bath street in said city of Cleveland, situated northwardly of a line drawn parallel with the southerly line of Bath street and one hundred and thirty-two feet northwardly at right angles therefrom—excepting and reserving therefrom a piece or parcel bounded southerly by the last described line—eastwardly by a line drawn parallel with the westerly face of the stone pier so-called, and one hundred (100) feet eastwardly therefrom—and northwardly by a line drawn parallel with the south line of Bath street and two hundred and eighty-two (282) feet northwardly therefrom, which is reserved for public use as a part of Bath street and also reserving and excepting therefrom a strip of twenty-five feet in width, bounded westerly by the west face of said pier and eastwardly by a line parallel therewith and twenty-five feet therefrom and extending from the northerly line of said last described parcel of land along said pier to the northwardly end thereof as it now is, or may be hereafter extended, which is to be kept as a public highway, and shall not be obstructed by said city, or by any person or persons, or company claiming through said city or by their permission.

"To HAVE AND TO HOLD the same to the said railroad company, its successors and assigns, upon the terms and subject to the stipulations and conditions following, that is to say:

"Said company shall take and hold the same subject to all legal claims either in law or equity, of any person or persons,

company or companies. It being expressly understood that the city does not guarantee nor warrant either the title or the right to occupy the same, the said railroad company to have all the money, compensation, interest, benefits and rights which the city could in any manner be entitled to on account thereof.

"Said company shall save said city harmless from all damages to persons holding any part or parts of the premises under leases from the city, consequent upon the taking possession of the ground so leased, or in any way depriving them of the full enjoyment of their leasehold interests before the expiration thereof, it being understood that this indemnification is to extend to such damages only as the city shall be legally holden to make good to the claimants thereof.

"All leases made by the city of the parts of said premises shall be assigned to said company—said company to have the right to collect and receive the rents hereafter accruing, and shall pay over to said city, two-thirds of all rents collected on land fronting on the river and lying between the south line of Bath street and a line parallel therewith and 282 feet northwardly therefrom, until said company shall deliver to said city the possession of said strip of 100 feet in width next to the pier hereinbefore reserved.

"And said company shall not renew or extend said leases, nor grant any new leases of any part of the premises which will interfere with the opening of Bath street to the width of 132 feet, or of the extension thereof on or near the stone pier as hereinbefore described.

"The said company shall not lease any part of the premises to any person or persons, company or companies, to be used for carrying or forwarding, storage or commission business, or for the erection of warehouses thereon, for the accommodation of such business, nor shall said company use said premises or any part thereof, for the purpose of engaging in, accommodating or aiding in the transaction of forwarding, commission or warehousing business, with a view either directly or indirectly of deriving profit therefrom, nor shall they grant the right to any railroad company, person or persons, or other company or companies so to do.

"But this prohibition shall not be construed to prevent said railroad company from erecting on said premises a suitable warehouse or warehouses for the reception and safe-keeping of such articles of property as may be entrusted to their care for transportation and not consigned to any person or persons or com-

pany in Cleveland having the means of storing the same. It being the object and intent of the parties to this agreement to provide that said premises shall not be so used as to interfere or come into competition with individuals, companies or firms engaged in forwarding, commission, storage or warehousing business in Cleveland, by carrying on or engaging in by said company, accommodating or aiding in forwarding, commission, storage, warehousing or other business not necessary to secure the transportation of property over their road, but may be used by said company for all purposes necessary for the convenient and profitable working of their road, subject to the restrictions aforesaid.

"Said company to take and hold said land subject to all the legal rights and claims of the Cleveland & Pittsburg Railroad Company upon the same, and to have all the benefits to accrue from such claimants as is before provided and as a further provision for same, shall upon reasonable and equitable terms, extend to said Cleveland & Pittsburg Railroad Company and the Cleveland, Painesville & Ashtabula Railroad Company; room for warehouse and passenger depots, and such facilities for coming on to said premises with their cars, engines and tenders, for the reception and delivery of passengers, baggage and freight, subject to the same restrictions as to warehousing, forwarding and commission business as are herein imposed upon the Cleveland, Columbus & Cincinnati Railroad Company, and for transferring them to or receiving them from other railroads, or from steamboats, either by independent tracks, or by use of the tracks laid by the Cleveland, Columbus & Cincinnati Railroad Company, as shall be found most convenient to all concerned, and in case the parties can not agree either as to the terms or manner of conveying such part of the premises as may be so required, the same shall be determined by three competent disinterested men; one to be chosen by each party and the third by the two so chosen. It being however understood that the Cleveland, Columbus & Cincinnati Railroad Company shall not be bound to permit either of said railroad companies to use for car, engine or warehouses, or grounds on which to place or dispose of cars, engines, tenders, or other furniture of their roads, any part of said premises which said arbitrators shall decide is necessary for those purposes to be used exclusively by said Cleveland, Columbus & Cincinnati Railroad Company. It being further understood and agreed that no part of said premises shall after two years from this date be used by said Cleveland, Columbus & Cincinnati Railroad Company, for forges, furnaces, work shops

or anything of similar character for the manufacture of cars, engines or other machinery, so as to deprive either of said other railroad companies of the full benefit of the use of part of said premises intended by this agreement to be extended to them.

"Said Cleveland, Columbus & Cincinnati Railroad Company shall manage and take care of all suits, or actions now pending or which may hereafter be commenced for obtaining possession of said premises or any part thereof, and may compromise or settle such suits. And said company shall save said city harmless from all costs and charges on account thereof, except such as have already accrued against the city, and in case of settlement, shall save the city harmless from all legal costs in the case in court in bank, except the costs made by the city. And shall further save the city harmless from all legal claims or demands which are now or may hereafter be set up against the city, growing out of the use or occupation of said premises by said city or its tenants or lessees. And to enable said company to compromise and settle with the claimants, Lloyd & Camp, and all other claimants for the extinguishment of their claims to said premises or any part thereof, they may allow them to retain such portion thereof as may be necessary to effect such settlement, and as shall not be deemed necessary to be used for railroad purposes.

"And the said Cleveland, Columbus & Cincinnati Railroad Company doth hereby covenant and agree to and with said city that said company will hold said premises upon the terms and subject to the stipulations and conditions herein recited, and will do and perform all and singular the acts required and abstain from doing and performing all and singular the acts prohibited by the terms and stipulations herein recited.

"In Witness Whereof, the city council of said city of Cleveland have caused to be hereunto affixed the seal of said city and these presents to be subscribed by the mayor thereof. And the Cleveland, Columbus & Cincinnati Railroad Company have caused to be hereunto affixed their corporate seal and these presents to be subscribed by their vice-president the day and year first above written.

"THE CITY OF CLEVELAND,
"By FLAVEL W. BINGHAM, *Mayor.*
" (Seal of the City of Cleveland, Ohio).
"THE CLEVELAND, COLUMBUS & CINCINNATI RAILROAD COMPANY,
"By JOHN W. WOOLSEY, *Vice-President.*
" (Seal of the Cleveland, Columbus & Cincinnati Railroad Company).

"Signed, Sealed and Delivered (the words 'Alfred Kelley' in the sixth line of first page being first erased and the words 'John M. Woolsey Vice,' interlined above such erasure. Also the word 'Vice' being first interlined above the second line from the bottom of the last page) in the presence of

"JAS. D. CLEVELAND,
"D. W. CROP.

"STATE OF OHIO, CUYAHOGA COUNTY, SS:

"Before me, Jas. D. Cleveland, a justice of the peace in and for said county, personally appeared the within named John M. Woolsey as vice-president of the Cleveland, Columbus & Cincinnati Railroad Company, and Flavel W. Bingham, as mayor of the city of Cleveland, and severally acknowledge the signing and sealing of the within instruments to be their several voluntary act and deed for the purposes therein expressed this 14th day of September, 1849.

"JAS. D. CLEVELAND,
"*Justice of the Peace.*"

The only statute of this state then authorizing contracts between municipal and railroad corporations, for the use and occupation by the latter of streets belonging to the former is found in Section 11 of "An act regulating railroad companies" (46 O. L., 40, 45), passed February 11, 1848. Section 9 of that act provided that any "such corporation is authorized to enter upon any land for the purpose of examining and surveying its railroad line, and may appropriate so much thereof as may be deemed necessary for its railroad, including necessary sidetracks, depots, workshops and water stations," etc.

The power of eminent domain was thus conferred upon railroads for the acquisition of private property for railroad purposes. For their acquisition of the right to use or occupy public property already devoted to public uses, Section 11 of the same act provided that:

"If it shall be necessary in the location of any part of any railroad to occupy any road, street, alley or public way or ground of any kind, or any part thereof, it shall be competent for the municipal or other corporation or public officers, or public au-

thorities, owning or having charge thereof, and the railroad company to agree upon the manner, and upon the terms and conditions upon which the same may be used or occupied; and if said parties shall be unable to agree thereon, and it shall be necessary in the judgment of the directors of such railroad company, to use or occupy such road, street, alley, or other public ground, such company may apply to the court of common pleas of the county in which the same is situate, setting forth the aforesaid facts,'' etc.

The Revised Statutes of Ohio, Sections 3281 and 3283, now embody substantially similar provisions.

The latter of these statutes has since been construed to authorize the acquisition by railroad companies not of an exclusive and permanent estate or easement, but of a right merely to the joint use and occupancy with the public of lands which were already dedicated or appropriated to public uses. Such companies may, by agreement or action for appropriation, acquire the right to use a public street for such railroad purposes and in such manner as shall not destroy the street, or exclude the public use and enjoyment of any and every part of it for street purposes, or cause any nuisance therein, or interfere with the full control and supervision thereof by the municipal authorities. *L. S. & M. S. Railroad Co.* v. *City of Elyria,* 69 Ohio St., 414; *Railroad Co.* v. *Defiance,* 52 Ohio St., 262; *Zanesville* v. *Fannan,* 53 Ohio St., 605; *L. & N. Railroad Co.* v. *City of Cincinnati,* 76 Ohio St., 481.

It follows that unless the rights of the defendants below are otherwise enlarged, the contract of September 13, 1849, must be restricted in its operation to the limitations prescribed by the construction thus put upon the statute wherein it rests, and that as so restricted it could afford no defense to the action below.

A striking fact, however, in this case and one upon which the defendants below place much dependence, is the great interval between the accrual and the assertion of the city's right, together with the defendants' outlay in the erection of many large and costly structures upon the premises during that interval

under color of absolute ownership thereof, for their railroad purposes.

If the city were asserting a merely proprietary title, its action would scarcely lie after this lapse of time, but its title to its streets is held, as already noted, in trust for the public, whose sovereign right no prescription nor laches should abridge.

We are not unaware of the early decisions in this state affirming the application of the statute of limitations to somewhat similar cases. But the authority of those decisions is questioned in *Heddleston* v. *Hendricks,* 52 Ohio St., 460, where Minshall, J., says at page 467:

"More recent cases place the right of the public as against encroachments on its highways, however long continued, on the ground that they are public nuisances in favor of which the statute of limitations does not run."

See also *L. S. & M. S. Railroad Co.* v. *City of Elyria,* 69 Ohio St., 414, 435; *Wasteney* v. *Schott,* 58 Ohio St., 410, 415.

Those early decisions are, moreover, contrary to the well-defined current of American authority, and this court has long since determined that their application must be restricted to the particular facts upon which they are founded, until they shall be, as they ought to be, overruled. *Wright* v. *Oberlin,* 23 C. C., 509; *Morehouse* v. *Burgot et al,* 22 C. C., 174.

So also the loss by mere abandonment, mere non-user, of the common right of highway rests finally on no other or better footing than loss by adverse possession, and is therefore equally illusory (*Nail & Iron Co.* v. *Furnace Co.,* 46 Ohio St., 544). Nor does the doctrine of equitable estoppel, when invoked to accomplish the same result, occupy any firmer foundation. If, as already shown, the Legislature can not, unless in the exercise of eminent domain, authorize property to be diverted from the public use to which it was originally dedicated, it is, of course, beyond the reach of any subordinate agency of government so to do; and that which is thus incapable of direct accomplishment must be equally unattainable by indirection. So where

there is an entire absence of power to make a grant originally, there can be no room for an estoppel to grow up afterwards (*Railroad Co.* v. *City*, 76 Ohio St., 481, 507). And this is so because whoever relies upon the conduct of public authorities must take notice of the limits of their power. *Hubbard* v. *Fitzsimmons*, 57 Ohio St., 436, 449.

It being once established that the premises in controversy were originally dedicated to the public for street purposes, no grant, nor prescription, nor mere non-user, nor equitable estoppel can change its status.

In the case, however, of the defendant, the Cleveland & Pittsburg Railroad Company, the plea of the statute of limitations is said to rest upon a different footing, since it claims under a chain of title independent of the contract of 1849, and perhaps also of that on which the dedication of Bath street depends. The intrinsic merits of this title need not be examined, for it is conclusively presumed, as already stated, to be inferior to the ancient title of the city of Cleveland, and its merit is moreover immaterial to the application of the statute of limitations.

Unfortunately for this plea, however, the defendant interposing it is confronted with its own formal public disclaimer of the color of title which it now claims then ripening into prescriptive right. After the contract of 1849 was entered into, this defendant was called upon to defend its right of possession and occupancy in an action brought by Henry Holmes and Julius C. Sheldon et al, on behalf of themselves and the other heirs of the stockholders of the Connecticut Land Company to recover the Bath street property. The suit was tried before Judge McLean in 1857, and is reported in 93 Fed. Rep., 100. The claim of the plaintiffs was that the city of Cleveland had abandoned Bath street, and that the plaintiffs, therefore, as heirs of the original proprietors, had a right to recover possession of the property. The Cleveland & Pittsburg Railroad Company by its answer, expressly repudiated the claim of title on which it now seeks to found its prescriptive right, and it, and the other defendant railroad companies planted themselves squarely

and solely upon their rights as derived from the contract of 1849. These answers aver, as to each defendant:

"That it has the right as a component part of the public, to occupy with the consent of said city said Bath street in the manner and for the purposes aforesaid; that such are a great public accommodation and not incompatible with the purpose intended by said Connecticut Land Company in dedicating the same to the public, as aforesaid, but consistent therewith, and that the city of Cleveland in permitting this defendant thus to use a limited portion of said street and thereby distributing its legitimate use so as to best subserve the convenience and business interests of its inhabitants and the rest of the public, has committed no breach of trust nor violated any public or private right, but performed rather a duty which it owned as well to the forecast of said land company as to the public."

This defense prevailed and the contract was upheld. The city was not a party to the action, and therefore is not bound by the judgment, but that fact affords no reason for refusing to give effect to the Cleveland & Pittsburg Railroad Company's admission that it was not then holding adversely to the city, as it now claims to have done. Not only is its answer in the Holmes case admissible in evidence now, but it is conclusive as against its alleged title by prescription, not indeed by any tolling of the statute, but by characterizing the defendant's possession as permissive, and consistent with the original public use.

And this is after all the common footing of all the railroads under the contract of 1849, the act of 1848, and the dedication of Bath street as such. It is doubtful if any unequivocal permanent exclusion of the public use or complete disseizin of the city ever occurred before this action was begun. The contract of 1849 passed to the railroads, so far only as the grantor had "the power or legal authority so to do, the right to the full and perpetual use and occupancy for their railroad tracks, turn-outs, engines, and car and passenger houses, turn tables, water tanks or stations, avenues to and from the same, leaving open spaces between when deemed expedient," etc. This appropriation of an easement for railroad purposes in part of Bath street was valid

in so far only as the parties had the corporate power and the lawful right to agree to it. The scope of the easement was expressly left open to judicial construction, and no lawful right, either permissive or prescriptive, can spring therefrom to permanently exclude the public use of any part of Bath street for street purposes.

Another defense relied upon by the defendants below is the alleged change in the judicial construction of Section 11 of the act of February 11, 1848 (46 O. L., 45), and Section 3283, Revised Statutes, since the contract of 1849 was entered into thereunder. In fact, no judicial construction of said section was ever made prior to that time, for the original act had been in force but little more than a year, when the contract was made. It is said, however, that the same doctrine applies, where, on the faith of a construction judicially pronounced by the court of last resort in any state, upon a statute of the same state, property rights have grown up or been extended prior to a change in such construction as evinced in later decisions.

Whether this modification of the well-known rule of property be tenable or otherwise, it is not true that any such change of judicial construction of the statutes in question has taken place in the decisions of the Supreme Court of Ohio. It is true that various dicta appear in the opinions of judges of the Supreme Court touching upon the proper construction of this statute, prior to and inconsistent with the formal decisions by the Supreme Court above cited. But in no case were these dicta necessary to the decision of the cases in the report of which they appear, nor even essential to the lines of reasoning upon which these decisions of the court were founded and forfeited. *Little Miami Railway Co.* v. *Commissioners of Greene County,* 31 Ohio St., 338; *Cincinnati & Southern Railroad Co.* v. *Carthage,* 36 Ohio St., 631; *State* v. *Railway Co.,* 37 Ohio St., 158.

The rule of property which has been invoked in this connection has no application where the supposed rights that were swept away by later decisions have been founded upon no more substantial basis than mere *obiter dicta. Friedman* v. *Suttle,* 9 L. R. A. (N. S.), 933.

The principle, moreover, on which the present authoritative interpretation of Section 3283 rests, was foreshadowed as long ago as *Hatch* v. *Railway Co.*, 18 Ohio St., 92, 119; and still more clearly in *Hickok* v. *Hine*, 23 Ohio St., 523. paragraph six of the syllabus of which reads:

"Where the Legislature has power to require one public easement to yield to another more important, the intention to grant such power must appear by express words, or by necessary implication; and such implication arises only when requisite to the enjoyment of the powers expressly granted, and can be extended no further than such necessity requires."

So also in *Little Miami and Columbus & Xenia Ry. Co.* v. *Dayton*, 23 Ohio St., 510, paragraph 1 of the syllabus reads:

"Land appropriated to a particular public use is not thereby withdrawn from the liability to be taken by legislative authority, in the exercise of the power of eminent domain, for another public use; but a subsequent grant can not be construed to authorize the destruction or subversion of the former use, unless such appears by express words, or by necessary implication, to be the legislative intent."

These cases are all prior to those relied upon by the defendants in this behalf.

And the answers of the railroads in the *Holmes* case, already referred to, show, moreover, a considerable appreciation, even at that early day, of the true construction of the statute of which their rights are founded, and the perils which they would encounter should they undertake utterly to exclude the public from the street use to which the property in question had admittedly been dedicated.

As a last resource the defendants below invoke the doctrine of inherent corporate power to compromise and settle property rights which are the subject of a *bona fide* dispute or litigation. It is claimed that the contract of 1849 can and should be upheld as an agreement for the compromise and settlement of certain claims against the city of Cleveland to parts of the premises in

controversy upon grounds which went to the city's title to the entire tract.  One claim of this sort had indeed been so far prosecuted as to be in judgment against the city and to be pending on review in the Supreme Court of Ohio.  The contract of 1849 refers to these claims in the concluding paragraph thereof, as already quoted at length.

The power to compromise and settle is doubtless inherent in all corporations as a corollary of the powers to sue and to sued. There are, however, several objections to the application of this doctrine to the facts of the present case.

In the first place, the rights which the city is claimed to have parted with by virtue of its power to compromise and settle, are not of a merely proprietary nature. They are, in a sense, governmental.  The defendants contend, however, "that a municipality in dealing with public grounds or streets has precisely the same power to protect herself against threatened loss through possible unfavorable results of litigation; precisely the same power to protect herself by compromising a doubtful right, that pertains to an individual dealing with property.  Two well-considered cases illustrate the correctness of this proposition."

The first of these cases, *Mills* v. *Railroad Co.*, 47 Ia., 66, is not applicable to the distinction thus drawn, for the property there in question, though publicly owned, was neither dedicated nor appropriated to specific public uses.

The other case, *City of St. Louis* v. *United States*, 92 U. S., 462, though in point, is shorn of its force by the circumstance that the property, surrendered under the compromise, passed to the government; from which it was derived.

In *Northern Pacific Railway Co.* v. *State of Minnesota, ex rel Duluth*, 208 U. S., 583, 598, on the other hand, the incapacity of municipalities to exercise their implied powers of compromise and settlement in derogation of their governmental functions is illustrated by the statement that "the exercise of police power can not be limited by contract for reasons of public policy, nor can it be destroyed by compromise; and it is immaterial upon which the contracts rest, as it is beyond the authority of

the state or the municipality to abrogate this power so necessary to the public safety."

But be this as it may, a conclusive objection to the application here of the doctrine of compromise is that no compromise was in fact effected by the contract. The claimants to the property as against the city of Cleveland were not parties to this agreement, and the city neither assured its peace nor its permanent title to any residue of the property by virtue of any covenant in the contract contained. The claimants were still at liberty to prosecute their actions and vindicate their claims without let or hindrance so far as any bar interposed by this contract was concerned. Clearly a city may not settle a litigated street title by getting someone to buy both street and lawsuit.

Upon the whole record we fail to find any reversible error. It is clear that the railroads have no right to maintain any permanent structures on these premises, except their tracks, and those only so far as they are compatible with the concurrent use of every part of the street and its accretions for public travel.

Recurring, however, to the uncertainty of the judgment below, we exercise our power to modify the same so that it shall read as follows:

"This cause coming on for hearing this day, and all parties hereto having waived a jury and submitted this case to the court, the same was heard upon the pleadings and the evidence; and upon consideration thereof the court finds that the plaintiff has a legal estate in and is entitled to the immediate possession of the premises described in the petition, subject to all such contract rights as defendants, or any of them, may have under and by virtue of a contract, dated September, 1849, by and between the city of Cleveland and the Cleveland, Columbus & Cincinnati Railroad Company, which said contract is recorded in Vol. 51, pages 187, 188, 189 and 190 of the records of Cuyahoga county, Ohio, and being the same contract referred to in the pleadings of the parties herein, including such rights under and by virtue of said contract as any of said defendants have acquired by succession from or agreement with the Cleveland, Columbus & Cincinnati Railroad Company, its successors or assigns, to lay, maintain and use tracks over and across the por-

tions of said premises hereafter designated as first, second and third parcels, without thereby or in any manner excluding free use of the whole and every part of said premises by the public for street purposes and full control and supervision of the same by the proper municipal officers of said city.

"And the court further finds that the defendants have unlawfully kept the plaintiff out of the possession of said premises," etc.

The judgment will proceed as rendered below save that any further mention of said contract rights shall be qualified by the insertion thereunder of the words, as aforesaid.

As so modified, the judgment below is affirmed.